No. 82-448

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

WILLIAM GRIFFEL,

        Plaintiff and Appellant,

  -vs-

COVE DITCH COMPANY,

        Defendant and Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,
In and for the County of Stillwater,
The Honorable Diane G. Barz, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Lee Overfelt; Overfelt Law Firm, Billings, Montana

    For Respondent:

        Joseph M. Bradley, Laurel, Montana

Submitted on Briefs: August 18, 1983

Decided: January 5, 1984

Filed: JAN 5 - 1984

*Ethel M. Harrison*
—————————————————————
            Clerk

Mr. Chief Justice Frank I. Haswell delivered the Opinion of the Court.

In an action for damages for crop loss with a counterclaim for injunctive relief, the Stillwater County District Court denied plaintiff damages and granted defendant injunctive relief against plaintiff. We modify the injunctive judgment and as modified, we affirm.

In 1958 Griffel acquired certain farm property from James Anhin in Stillwater County, Montana. Included in the purchase was 39.18 shares of stock in the Yellowstone Ditch Company. Cove Ditch Company provides water to shareholders of Yellowstone pursuant to a contract dated January 25, 1906. The 1906 contract required that the Yellowstone Ditch Company and all its shareholders turn over to the Cove Ditch Company the ownership, operation and maintenance of the old Yellowstone Ditch and a right-of-way along the entire length of the canal so Cove could enlarge the canal to serve its own shareholders. In return, shareholders of Yellowstone would receive the amount of water they received prior to the contract free of charge.

The contract obligates the Cove Ditch Company to use all proper diligence and reasonable care to keep the requisite amount of water flowing in the ditch, but specifically exempts Cove from furnishing such amount of water during periods of extreme low water in the Yellowstone River or when unavoidable accidents occur. The 1906 contract further obligates the Cove Ditch Company to maintain the level of the water in the ditch at the same height as in the old Yellowstone Ditch, so that the water could flow through the headgates of the Yellowstone shareholders as then located or

2

as constructed after the date of the contract by mutual consent.

The Cove Ditch Company employs a ditch rider or ditch superintendent to manage and operate the ditch, to maintain the ditch, and to adjust water diversion by shareholders in times of low water. Cooperation is required from all shareholders to ensure the availability of water.

Since 1959 Griffel has attempted to irrigate a particular portion of his property higher in elevation than the ditch itself. Evidence indicates that this property had not been previously irrigated on a regular basis.

Griffel has utilized two methods to irrigate this property. First of all, he placed a check or dam on the ditch to raise the level of water behind the check higher than normal. This allowed water to flow to the higher lands by gravity. The check is constructed of several boards placed in the water vertically, supported by a horizontal log placed across the ditch. There is testimony that would indicate this method has not been used by any of Griffel's predecessors.

When Griffel used the check system, water would back up the ditch, increasing pressure therein and causing seepage through the banks. Also, the flow downstream would be reduced, affecting the irrigation of farms below the check.

Cove's ditch superintendent is responsible for water delivery to shareholders of both Yellowstone and Cove. Therefore, he would remove some of the boards in Griffel's check to improve the flow in the ditch.

The second method by which Griffel would irrigate was by pumping. He would pump water to land both lower and higher than the ditch. This occurred without permission from

Cove and sometimes this method was used simultaneously with the check system. The ditch superintendent testified that he thought Griffel was pumping after he made his rounds attempting to conceal such activity.

In his deposition, Annin stated that his irrigation method was essentially by gravity flow and that he only attempted to pump to the higher lands on several occasions but it was ineffective. He further stated that he understood that pumping required separate permission from Cove.

According to the 1906 contract, Griffel's 39.18 shares of Yellowstone stock entitles him to approximately 400 miners inches of water. Testimony indicates that by utilizing each method to irrigate higher lands, he was taking considerably more than his contractual allotment, especially when checking and pumping were simultaneous.

It should be noted that on the concrete supports of the headgate, there are two marks, one above the other. The ditch superintendent testified that he never let the water level behind Griffel's check go below the lowest mark, usually it was left between the two marks. Frank Wodnik, a professional irrigation engineer, testified that if the water level was maintained at the lower mark Griffel would receive over 400 inches of water, even more if his lateral ditches were clean and unobstructed. This witness further testified that Griffel could irrigate all but two acres of the property in question with a water level set at the lower mark and properly maintained lateral ditches.

Griffel brought the present action alleging that Cove had a duty to deliver him approximately 400 miners inches of water and has failed to do so. He argues that Cove has also failed to maintain the ditch and provide necessary water

4

checks, pumps, power and equipment. Because of Cove's failure to perform its duty, Griffel contends that he has not been able to adequately irrigate his land between 1968 and 1973, causing substantial crop loss. He alleges injury between these years. From 1974 to the present, Griffel has received sufficient water for irrigation.

The action was initially brought in 1973 seeking damages in the amount of $20,000. Griffel's original counsel retired, and his new counsel filed an amended complaint on June 3, 1980, demanding $104,621 plus punitive damages. By stipulation the request for punitive damages was dropped. Cove subsequently filed a counterclaim and third party complaint against Griffel and Yellowstone. The action against Yellowstone was dismissed.

The case was tried on April 12 and 13, 1982, before the Honorable Diane G. Barz of the Thirteenth Judicial District. The District Court held that use of the check and open pipes and pumps to irrigate lands above and below the ditch results in a diversion of water in an amount greater than the 400 miners inches allowed under the contract. This change in diversion and amount diverted is a violation of the 1906 contract. The court further held that Cove has provided Griffel with water pursuant to the contract and thereby has not breached any of its duties to him under the 1906 contract.

The court enjoined Griffel from checking the ditch higher than the lowest mark on the headgate and from placing and removing the check without prior notice to Cove. He was further barred from pumping water from the ditch and irrigating lands above the ditch without prior consent and approval from Cove.

5

From this ruling Griffel appeals and raises four issues for our consideration:

1. Did the District Court err in determining that Cove did not breach any duties to Griffel according to the 1906 contract and that it was Griffel who violated the terms of the contract?

2. Did the District Court err by prohibiting Griffel from pumping without the consent and approval of Cove?

3. Did the District Court err by prohibiting Griffel from irrigating land higher in elevation than the ditch without consent and approval of Cove?

4. Did Griffel acquire a right to pump from Cove ditch by adverse possession?

First, Griffel argues that the findings and conclusions of the District Court regarding the breach of contract are not supported by the evidence. Some are even contrary to undisputed evidence.

Cove, on the other hand, contends that substantial evidence supports the finding that Griffel was never denied water and Cove did not cause him any crop loss. Further, there is substantial evidence indicating that Griffel received more than his contractual share of water when he used the check and pumped from the ditch.

The scope of review for District Court findings and conclusions sitting without a jury is well settled in Montana. In Cameron v. Cameron (1978), 179 Mont. 219, 587 P.2d 939, reviewing this area of law, we stated:

> "'This Court's function in reviewing findings of fact in a civil action tried by the district court without a jury is not to substitute its judgment in place of the trier of facts but rather it is "confined to determining whether there is substantial credible evidence to support"

6

> the findings of fact and conclusions of
> law. Hornung v. Estate of Lagerquist,
> 155 Mont. 412, 420, 473 P.2d 541, 546.'
> Olson v. Westfork Properties, Inc.
> (1976), 171 Mont. 154, 557 P.2d 821, 823,
> 33 St.Rep. 1133.
>
> "Although conflicts may exist in the
> evidence presented, it is the duty of the
> trial judge to resolve such conflicts.
> His findings will not be disturbed on
> appeal where they are based on substan-
> tial though conflicting evidence, unless
> there is a clear preponderance of evi-
> dence against such findings. [Citations
> omitted.]" 587 P.2d at 944-945.

On the question of substantial evidence, we have held:

> "'Substantial evidence' is evidence such
> 'as will convince reasonable men and on
> which such men may not reasonably differ
> as to whether it establishes the [pre-
> vailing party's] case, and, if all rea-
> sonable men must conclude that the
> evidence does not establish such case,
> then it is not substantial evidence.'
> Morton v. Mooney (1934), 97 Mont. 1, 33
> P.2d 262, 265; Staggers v. USF&G (1972),
> 159 Mont. 254, 496 P.2d 1161, 1163. The
> evidence may be inherently weak and still
> be deemed 'substantial' and substantial
> evidence may conflict with other evidence
> presented. Campeau v. Lewis (1965), 144
> Mont. 543, 398 P.2d 960, 962." 587 P.2d
> at 944-945.

With respect to determining the credibility of witness-
es, we have ruled that determination of the weight given to
the testimony is the primary function of the trial judge
sitting without a jury and not that of this Court. 587 P.2d
at 945; Hellickson v. Barrett Mobile Home Transport, Inc.
(1973), 161 Mont. 455, 507 P.2d 523.

All of the above principles were reiterated in the
recent case of Turley v. Turley (Mont. 1982), 649 P.2d 434,
39 St.Rep. 1336.

The present case is based upon the 1906 contract.
Thus, in light of the principles stated above, we must deter-
mine whether there is substantial evidence supporting the

7

District Court's interpretation of the contract and conclusions based thereon.

The contract between Cove and Yellowstone provided that shareholders of Yellowstone would receive free water in proportion to their respective interest in Yellowstone in return for property rights allowing Cove to enlarge the existing ditch. The contract established a method by which the total flow rate could be calculated before expansion of the ditch. From this Yellowstone shareholders would receive their respective share of water. The total flow rate prior to enlargement was 3103.28 miners inches. Griffel had 39.18 shares of Yellowstone stock which entitled him to approximately 400 miners inches of water.

The District Court essentially found that by damming the ditch to a level higher than that of his predecessors and by irrigating high ground not historically irrigated Griffel has increased the amount of water diverted in violation of the 1906 contract. The court also held that Griffel's rights are not impaired by limiting the level of water behind the check to the lower of the two marks on the concrete support. Finally, the District Court found that Cove has not breached any of its duties or responsibilities under the contract.

We hold the District Court was correct in finding that Griffel had violated the terms of the contract by utilizing the check and pumps, as there is substantial evidence that he was taking considerably more than the 400 inches to which he was entitled under the contract. Also, we hold that the court was correct in finding Cove did not violate the terms of the contract, as there is substantial evidence that Cove supplied Griffel at all times with his allotment of water.

As previously mentioned, the testimony of Frank Wodnik indicates that Griffel's diversion system could carry over 400 inches of water when the ditch is checked to the lower mark, if his lateral ditches were properly maintained. In fact, with properly maintained ditches, he could irrigate all of the property in question except two acres with 400 inches of water. Wodnik further testified that backing the water up to the highest mark provides Griffel with substantially more than 400 miners inches.

Wes Thatcher, ditch superintendent for Cove, testified that he never lowered the water level below the lower mark on the concrete supports which provides enough water to flow into Griffel's diversion pipes. He also stated that most of the time he allowed the water level to be maintained between the higher and lower marks. His testimony further indicates that Griffel was never denied water and that when he backs the water up to the higher mark, Griffel gets 500 inches or better.

Jim Meyers leased the property in question from Annin during the years immediately preceding Griffel's purchase of such property. He testified that Cove had never denied him water nor caused him any crop loss.

The above testimony is substantial evidence supporting the District Court's conclusion that Griffel, through his irrigation methods, was taking more water than allotted to him in the contract, thus violating the contract. The above testimony also supports the conclusion that Cove did not breach any duties owing to Griffel.

We recognize that there is conflicting evidence that does not support the District Court's conclusions. However, we will not sit in the place of the District Court and

resolve such conflicts. Moreover, such conflicting evidence does not form a preponderance supporting a contrary conclusion.

Next Griffel contends that the contract does not provide that flood irrigation be the sole method of irrigation. Hence, as long as Griffel only diverts his 400 inches of water, his actual method of diversion is immaterial under the contract and the District Court erred in prohibiting him from pumping without Cove's consent.

Cove argues that restrictions on Griffel's practices are reasonable and do not deprive him of his proper share of water. In fact, checking the ditch to the lower mark allows Griffel to receive at least 400 inches of water by flood irrigation; thus, there is no error in prohibiting Griffel from pumping.

Resolution of this issue depends upon whether according to the contract or Montana law Griffel can change his method of diversion. First, the contract does not specifically establish a method for shareholders to utilize to divert their share of water from the ditch. Any term that arguably implies such conclusion would possibly reflect the state of the art in 1906 but does not create a covenant in this regard. Further, the existing law at the time Griffel alleges injury did not prohibit a change in the method of diversion but prohibited a change in point of diversion or change of use that could injure other appropriators. Section 89-803, R.C.M. 1947; see e.g., Thompson v. Harvey (1974), 164 Mont. 133, 519 P.2d 963.

We hold that Griffel should not be prohibited from pumping his entitlement from Cove Ditch. The contract unconditionally allows Griffel 400 miners inches of water and he

10

should be able to divert such water by whatever method is most feasible for his purposes. A contrary interpretation would foreclose utilization of future technological advances in water diversion and irrigation techniques. Thus, as long as he only takes his contractual allotment of water, Griffel should not be prohibited from pumping from the ditch, and the District Court erred in so ruling.

Griffel also argues that the District Court erred by prohibiting him from irrigating acreage above the canal. The contract does not speak to what acreage can be irrigated.

Cove asserts that those lands have not historically been irrigated and doing so requires more water than Griffel is entitled to. This, in effect, deprives shareholders downstream of their fair share of water.

As with the method of diversion, there is no provision in the contract indicating what land a shareholder can irrigate. Further, a change in use of water, under then existing law, was allowable under section 89-803, R.C.M. 1947. However, such change could not injure the rights of others. Thompson, supra; Spaeth v. Emmett (1963), 142 Mont. 231, 383 P.2d 812; McIntosh v. Graveley (1972), 159 Mont. 72, 495 P.2d 186; Thrasher v. Mannix & Wilson (1933), 95 Mont. 273, 26 P.2d 370; Lokowich v. City of Helena (1913), 46 Mont. 575, 129 P. 1063; Hansen v. Larsen (1911), 44 Mont. 350, 120 P. 229.

In this case, the evidence showed that Griffel was trying to irrigate land that had not historically been irrigated. In essence, he was attempting to change the use of his water. Furthermore, his lateral ditches taking in diverted water were in such condition that to irrigate the acreage in question he was required to take a quantity of

11

water greater than his contractual allocation. This was accomplished by using the check or by pumping. Frank Wodnik testified that these lands could only be irrigated by damming the water up to the highest mark on the headgate. In sum, this change of use would require Griffel to take more water than he was entitled.

Moreover, there is substantial evidence to support the District Court finding that the use of the check to dam the water to the highest mark deprives downstream users from water. Phillip Fox, farmer and a member of Cove's board of directors stated that when "Griffel puts his check in, the water drops in the ditch behind the check, and everybody down the line, especially the lower end, they don't get any water."

Injury is also caused to landowners upstream when Griffel uses the check. Thatcher testified that the increased pressure on the ditch caused by backed up water behind the check causes seepage into the property of upstream landowners.

We hold that the testimony discussed above is substantial evidence supporting the District Court's finding that Griffel's changed use (irrigating acreage higher that the ditch) causes injury to other water users by checking the ditch higher than normal and pumping water in excess of his entitlement. Consequently, the District Court did not abuse its discretion by prohibiting Griffel from irrigating property situated above the canal to the extent where he would misuse the check or pump or divert more than 400 inches of water. The District Court, however, cannot prevent irrigation of acreage higher than the canal if Griffel only diverts his contractual entitlement of 400 miners inches.

Finally, Griffel argues that he acquired a right to pump out of the ditch by prescription. This issue is moot since we have decided that as long as he only diverts his contractual allotment of water, he cannot be prohibited from pumping from the ditch.

We modify the District Court judgment to allow Griffel to pump from the ditch and to irrigate acreage higher than the ditch so long as he takes no more than his contractual allotment. As so modified, the judgment of the District Court is affirmed.

                                       _____
                                                Chief Justice

We concur:

_____

_____

_____

_____
                    Justices