No. 87-505

IN THE SUPREME COURT OF THE STATE OF MONTANA

1988

STATE OF MONTANA,

          Plaintiff and Respondent,

  -vs-

KENNETH DALE NETTLETON,

          Defendant and Appellant.

APPEAL FROM: District Court of the First Judicial District,
In and for the County of Lewis & Clark,
The Honorable Thomas Honzel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        J. Mayo Ashley, Helena, Montana
        Nicholas Jacques, Helena, Montana

    For Respondent:

        Hon. Mike Greely, Attorney General, Helena, Montana
        Paul D. Johnson, Asst. Atty. General, Helena
        Mike McGrath, County Attorney, Helena, Montana
        Carolyn Clemens, Deputy County Attorney, Helena

Submitted on Briefs: June 22, 1988

Decided: August 22, 1988

Filed: AUG 2 2 1988

_Clerk_

Mr. Justice R.C. McDonough delivered the Opinion of the Court.

Kenneth Dale Nettleton appeals from the judgment of the District Court of the First Judicial District, Lewis and Clark County, entered upon a jury verdict finding him guilty of deliberate homicide, a felony. We affirm.

Nettleton presents one issue for our review:

"Should two of the witnesses, both former spouses, have been allowed to testify regarding communications made to them during the marriage?"

On November 7, 1986, Nettleton was charged with the 1977 deliberate homicide of Gayla Sue Brisson. On March 18, 1987, Nettleton filed a motion to exclude the testimony of Candace Semenze and Magdelina DuMontier relating to statements made by Nettleton to the two women while married to them. According to Nettleton, Semenze was his common-law wife from June of 1975 until February of 1982, and he was married to DuMontier from July of 1983 until June of 1986. He asserted that his communications with the two women during marriage were privileged under § 26-1-802, MCA.

After a hearing on the motion, the District Court determined that sufficient evidence had been introduced to show a marriage between Nettleton and DuMontier, and between Nettleton and Semenze. However, the court denied the motion to exclude the testimony of the two women based on exceptions to spousal privilege. Both women then testified at trial, and are characterized by both parties as important witnesses.

Semenze testified at length about Nettleton's words and actions in her presence on the day of Brisson's death and thereafter. Among other things, she testified to seeing a scarf in Nettleton's car on the day after Brisson's death that was very similar to the one she had seen Brisson wearing

2

shortly before she was killed. She also testified about a chain of events following Brisson's death, when Nettleton told her he had killed Brisson, showed her the body, and forced her to assist him in a "cover-up" of the crime. Brisson's body was located under a small house trailer on the outskirts of Helena. The cover-up consisted of Nettleton and Semenze inspecting this trailer with an acquaintance of Nettleton's, Chris Nunn, under the pretense of being interested in purchasing it. During the inspection, Nettleton "discovered" Brisson's body.

Semenze's testimony about these events is interspersed with repeated threats and abusive remarks by Nettleton:

> He was really scaring me; and he said if you tell that he would -- if -- he said if you tell anybody about this that he would kill me
> . . .
> and we went back to -- back to that little trailer; and I was scared; and he pulled up to it; and he was scaring me; and he said, "You get out of the 'f---ing' car and pretend like you are interested in the trailer..."

Semenze further testified that although she and Nettleton were separated at the time of the killing, he forced her--again under threat of death--to move back in with him. While living with Nettleton, she was continually subjected to threats concerning what would happen to her or her baby should she ever disclose Nettleton's connection to Brisson's death. According to Semenze's testimony, these threats were sometimes accompanied by physical violence:

> He was always picking on me and threatening me, shoving me around and telling me that he would take [the baby]; and he said, "If you run, you can run to Texas; and I will find you;" and I just couldn't sleep. I was scared that he would do something. I was scared he was going to do something to [the baby]. I just didn't want to live with him but he made me live with him.

3

Semenze also testified about an occasion shortly after Brisson's death when she and Nettleton were riding in a pickup driven by Nettleton's brother. Nettleton had his brother stop on a bridge so he could throw a knife into the creek "to wash the finger prints off."

DuMontier likewise testified as to threats directed at her by Nettleton, as well as a "warning" from Nettleton's brother. DuMontier, like Brisson, had red hair. She testified that after having an argument with Nettleton at a tavern, she was warned by Nettleton's brother not to anger him because "Ken had already killed a red-headed girl." DuMontier also testified that when she later asked Nettleton about his brother's warning, he admitted to her that he had killed Brisson. She further testified that after she and Nettleton were divorced, he came to her house on at least one occasion and, according to DuMontier, "he got mad and started slapping me and just said that--called me Ga[y]la and said that I should should be dead already because he had killed me years ago."

On March 27, 1987, the jury returned its verdict finding Nettleton guilty of deliberate homicide. On August 25, 1987, the District Court sentenced Nettleton to 60 years in the Montana State Prison and denied his motion for a new trial. This appeal followed.

Before proceeding to the main issue framed by Nettleton, we will dispose of a preliminary question raised by the State. The State's argument to the District Court and its brief on appeal emphasize that Nettleton and Semenze were never married. According to the State, the alleged common-law marriage between the two did not have the four elements necessary under Montana common law: capability, agreement, cohabitation and reputation (citing Matter of Estate of Murnion (Mont. 1984), 686 P.2d 893, 41 St.Rep.

4

1627, and other cases). Whether the relationship between Nettleton and Semenze fit the legal definition of common-law marriage was a question of fact for the District Court to decide. That decision must be upheld if there is substantial, credible evidence in the record to support it. Griffel v. Cove Ditch Co. (Mont. 1984), 675 P.2d 90, 41 St.Rep. 1.

The record shows that while Semenze denied the existence of the marriage in her testimony, she and Nettleton lived together, had a child, opened and used a joint checking account, and filed joint income tax returns for two consecutive years. The record also shows the filing of a joint petition for divorce signed by Semenze and Nettleton. This evidence provides a sufficient basis for the District Court's decision that Nettleton and Semenze considered themselves married, and we will conduct our review under the assumption that the marriage existed.

The issue on review is thus the exceptions to spousal privilege adopted by the District Court and contested on appeal by Nettleton. Section 26-1-802, MCA, is Montana's spousal privilege statute:

> Spousal Privilege. A husband cannot be examined for or against his wife without her consent or a wife for or against her husband without his consent; nor can either, during the marriage or afterward, be, without the consent of the other, examined as to any communications made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other or to a criminal action or proceeding for a crime committed by one against the other.

Nettleton argues that the District Court misapplied § 26-1-802, MCA, and the exceptions found by the court to allow testimony by Semenze and DuMontier are contrary to existing

case law. However, if the District Court's ruling was correct, we will affirm it irrespective of the reasoning used to support it. Norwest Bank of Billings v. Murnion (Mont. 1984), 684 P.2d 1067, 1071, 41 St.Rep. 1132, 1136.

At the outset, we note the statute's wording, which protects "communications made by one to the other during the marriage." Given this wording, some of the testimony disputed by Nettleton does not come within the privilege afforded by § 26-1-802, MCA. Testimony by DuMontier concerning Nettleton's actions and statements after the two were divorced is not at issue here, because those statements were not made during marriage. Nor is testimony by Semenze or DuMontier involving statements or actions by persons other than Nettleton at issue, because those were not communications by one spouse to the other.

The doctrine of spousal privilege has its roots in English common law. The original doctrine was based on the archaic principle that a husband and wife were a single legal entity, and therefore could not testify against one another. See 8 J. Wigmore, Wigmore on Evidence § 2228, at 214-15 (J. McNaughten ed., 1961). The doctrine arrived in this country via the common law, being first recognized by the United States Supreme Court in Stein v. Bowman (1839), 38 U.S. 209. Most states have subsequently codified spousal privilege. The original form of § 26-1-802, MCA, was enacted by the Montana legislature in 1867.

As the doctrine of spousal privilege has undergone changes over time, so has Montana's statute. Section 26-1-802, MCA, has been amended or re-enacted 15 times. Changes made to spousal privilege by various courts and legislatures have drawn criticism from modern commentators, who say the somewhat piece-meal approach of carving out exceptions to the original rule has made the nation-wide body

6

of law on spousal privilege confusing and sometimes contradictory. See McCormick on Evidence, §§ 78 et seq. (E. Cleary ed., 1984). The current form of § 26-1-802, MCA, contains two of the more common exceptions found in other states: spouses can testify in a civil action by one against the other, or a criminal proceeding for a crime committed by one against the other.

In light of the criticism aimed at the sometimes confusing state of spousal privilege law, we will address the exceptions relied on by the District Court with an eye toward keeping what is still a fairly small body of law in Montana as uncluttered as possible. We are aided in this approach by the fact that much of Montana case law interpreting § 26-1-802, MCA, and its predecessors has a common thread: in order to be protected by the privilege, proffered testimony must possess certain threshold characteristics of marital communications.

The District Court found one exception to spousal privilege for Semenze's testimony as to what she had observed at the time of the homicide. We have previously held that exclusion of testimony through spousal privilege requires that the testimony deal with "communications only, that is utterances and not acts." State v. Houchin (1967), 149 Mont. 503, 507, 428 P.2d 971, 973. See also United States v. Bolzer (9th Cir. 1977), 556 F.2d 948, 951 (reviewing a case from the U.S. District Court for the District of Montana, and holding the privilege applies only to "utterances or expressions intended by one spouse to convey a message to the other"). We have also held that spouses may testify about their feelings that result from privileged communications. Matter of J.H. (1982), 196 Mont. 482, 487, 640 P.2d 445, 448. At a minimum, then, the communication for which privilege is sought must be an utterance or other expression intended to

7

convey a message to the other spouse. Testimony by Semenza or DuMontier as to observations of Nettleton's actions; physical evidence such as Brisson's body, her scarf or Nettleton's knife; and feelings such as the fear induced by Nettleton's threats and other behavior do not meet this minimum, and were therefore admissible.

This Court also recognizes that a spouse can waive spousal privilege by making the allegedly privileged communications in the presence of a third party. In re Marriage of Sarsfield (1983), 206 Mont. 397, 671 P.2d 595. The terms of our early discussion of this waiver show another required characteristic of privileged marital communications. In Thompson v. Steinkamp (1947), 120 Mont. 475, 187 P.2d 1018, we said,

> The court was right in overruling defendant's objection to the testimony of Mrs. Thompson under the circumstances. Mr. Thompson did not regard the communications in question as confidential in any sense because, as above noted, the court was warranted in finding that he made the communications to others besides his wife.

Thompson, 187 P.2d at 1021 (emphasis added). Communications that pass the threshold of being utterances intended to convey a message must also be regarded by the communicating spouse as being at least somewhat confidential. Section 26-1-801, MCA, the statute that sets forth the policy behind Montana's privilege statutes, reads as follows:

> Policy to protect confidentiality in certain relations. There are particular relations in which it is the policy of the law to encourage confidence and to preserve it inviolate; therefore, a person cannot be examined as a witness in the cases enumerated in this part.

8

The policy set forth in § 26-1-801, MCA, applies to the spousal privilege in § 26-1-802, MCA, and meshes with that found in the laws of most states:

> Most statutes expressly limit the privilege to "confidential communications." However, even where the words used are "any communication" or simply "communications," the notion that the privilege is born of the "common law" and the fact that the pre-statutory descriptions of the privilege had clearly based it upon the policy of protecting confidences, have actuated most courts to read into such statutes the requirement of confidentiality.

McCormick §80, at 193, and authorities cited therein. Semenze's testimony as to statements made by Nettleton in the presence of Chris Nunn while feigning interest in purchasing the house trailer, and Nettleton's statement that he was throwing his knife into the creek in order to wash off fingerprints, was therefore proper. The presence of third parties indicates that Nettleton did not intend those statements to be confidential.

The District Court also found an exception to the privilege for statements made by Nettleton while beating or threatening DuMontier and Semenze. The court found this exception in this Court's reasoning from Sarsfield. In Sarsfield, we began with the proposition that the purpose behind spousal privilege is to preserve the sanctity of the marriage and home, citing our decisions in J.H. and State v. Taylor (1973), 163 Mont. 106, 515 P.2d 695. We also said, "This privilege, however, is subject to the maxim that, when the reason for a rule ceases to exist, so then should the rule. See Section 1-3-201, MCA." Sarsfield, 671 P.2d at 600. In Sarsfield and J.H., we held that acts of child abuse destroyed the sanctity of the marriage and home, and along with it the reason for having a spousal privilege. We

9

therefore upheld district court decisions utilizing testimony of one spouse as to child abuse committed by the other.

Child abuse, however, presents a nearly unique problem. The child is a "third party" to the marital relationship insofar as the language of § 26-1-802, MCA, is concerned, and yet is an integral part of that relationship. While those cases did not fit neatly into the scheme of the statute, strong policy considerations called for admission of testimony that might constitute the only available probative evidence. Child abuse has generated a large body of law in various jurisdictions, and has come to be regarded in a growing number of states a crime against the non-abusing spouse, and therefore an exception to the privilege. See 2 Wharton's Criminal Evidence § 367, at 471-73, (C. Torcia ed., 1986), and authorities cited therein. In this case, we are concerned only with spouses. Rather than muddying the waters by attempting to apply the rule from Sarsfield and J.H. to the present situation, we will evaluate the District Court's ruling in light of the threshold characteristics outlined above.

As stated above, the body of Montana law on the subject of spousal privilege is fairly small. However, states with statutes similar to § 26-1-802, MCA, furnish guidance as to how the privilege applies in cases of cruelty or abuse by one spouse against the other. A trend has developed that is enlightening:

> [I]t has been held by most courts that a spouse's testimony as to acts of cruelty or abuse is admissible on the ground that no confidential communication is involved, or that the information was not gained as a result of the marital relation.

81 Am Jur 2d, Witnesses, § 167. The spousal privilege statute in the state of New York reads in relevant part:

10

> A husband or wife shall not be required, or, without the consent of the other if living, allowed, to disclose a confidential communication made by one to the other during marriage.

CPLR § 4502(b). In People v. Melski (N.Y. 1961), 176 N.E.2d 81, and more recently in People v. D'Amato (N.Y. Sup. Ct. 1980), 430 N.Y.S.2d 521, the courts of New York have held that threats are not confidential marital communications protected by the privilege:

> The statutory privilege covers only those private exchanges which "would not have been made but for the absolute confidence in, and induced by, the marital relationship."
> . . .
> defendant's confessed involvement in the fire at the Blackwell apartment did not come as a remorseful outpouring of guilt and anxiety to his wife; rather his admission to the arson was an inseparable part of his larger threat to burn down the homes of his wife's closest relatives
> . . .
> Such words of abuse and cruelty uttered with the intent to injure the other spouse fall outside of the privilege's protection.

D'Amato, 430 N.Y.S.2d at 522, 524.

The spousal privilege statute in the state of Washington is even more similar to our own, and reads in relevant part:

> A husband shall not be examined for or against his wife, without the consent of the wife, nor a wife for or against her husband without the consent of the husband; nor can either during marriage or afterward, be, without the consent of the other, examined as to any communication made by one to the other during marriage.

RCWA 5.60.060(1) (emphasis added). In State v. Moxley (Wash. Ct. App. 1971), 491 P.2d 1326, the Washington Court of Appeals held the defendant's threat to kill his wife was not a

communication induced by the marital relationship, and therefore was not privileged.

A full and workable definition of the threshold for communications between spouses deemed privileged would thus require two elements. First, the communications must be utterances or other expressions intended to convey a message from one spouse to the other. Second, the message must be intended by the communicating spouse to be confidential in that it was conveyed in reliance on the confidence of the marital relationship.

The testimony of both Semenze and DuMontier contains admissions by Nettleton that he had killed Brisson, as well as comments about the method he used. However, with only one exception, these statements were not, as the court in D'Amato put it, "remorseful outpouring[s] of guilt and anxiety" to the two women. They were instead an effort to terrify and intimidate the women into keeping silent about Brisson's death, and in Semenze's case, to induce her to cooperate in a cover-up and then live in Nettleton's home under his control. Nettleton did not rely on the confidence of his marital relationships with Semenze and DuMontier. He relied on fear and intimidation. His threatening statements do not possess the threshold characteristics of confidential marital communications protected by spousal privilege.

A review of the trial transcript reveals that the vast majority of the testimony by DuMontier and Semenze was outside the scope of the protection of § 26-1-802, MCA. Most of DuMontier's testimony concerned communications with Nettleton when the two were not married. Indeed, DuMontier's most damaging testimony concerned Nettleton's statements calling her Gayla and telling her she should be dead because he had killed her years before. This incident occurred after Nettleton and DuMontier were divorced. Semenze's testimony

consisted largely of threats by Nettleton to induce her cooperation and silence, which do not merit spousal privilege. The one clear instance of testimony that should have been protected by the privilege--Nettleton's admission to DuMontier in response to her question while they were married--simply restates the same information contained in the far greater number of non-privileged statements. The failure of the District Court to exclude this testimony was therefore harmless error. See State v. Shaw (1982), 199 Mont. 248, 648 P.2d 287.

We affirm the decision of the District Court.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

13