No. 02-331

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 346

STATE OF MONTANA,

       Plaintiff and Respondent,

   v.

GREGORY DEAN BALDWIN,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade, Cause No. CDC-01-233(1),
The Honorable Kenneth R. Neill, Judge presiding.

COUNSEL OF RECORD:

       For Appellant:

          Kristina Guest, Appellate Defender Office, Helena, Montana

       For Respondent:

          Hon. Mike McGrath, Attorney General; Jim Wheelis,
Assistant Attorney General, Helena, Montana

          Brant Light, Cascade County Attorney, Susan Weber, Deputy County
Attorney, Great Falls, Montana

Submitted on Briefs: April 3, 2003

Decided: December 16, 2003

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1     Gregory Baldwin (Baldwin) was convicted by a jury in the Eighth Judicial District Court of three charges related to the production of methamphetamine. Baldwin appeals his conviction. We affirm.

¶2     We address the following issues on appeal:

¶3     1. Did the District Court err when it allowed eyewitness identifications of Baldwin by Krystal and Maureen Schur?

¶4     2. Did the District Court err when it denied Baldwin's motion to exclude the testimony of Karin Nelson Baldwin?

BACKGROUND

¶5     On April 23, 2001, Krystal Schur (Krystal), who was seventeen at the time, alerted teachers and law enforcement that her father, Matt Schur (Matt), was producing methamphetamine at her home in Great Falls. Krystal reported that three other men were involved in the production of methamphetamine, including Baldwin. On April 22, 2001, the men worked in the garage, and Krystal detected an unusual odor which she described as "wart remover" in the garage and on her father and the other men. Matt told Krystal to stay out of the garage, which he had never done before, causing her to become more suspicious. That night, Krystal and her family had dinner with the three men, although Baldwin took his plate into the garage after five or ten minutes. Krystal saw Baldwin inside her house three times that day.

¶6     Krystal's mother, Maureen Schur (Maureen), testified that the same day she saw Matt and the other men with methamphetamine. She mistakenly identified Greg Baldwin as

2

"Craig." Maureen described the odor emanating from the garage and the men as smelling like "cat urine." Baldwin showed her the methamphetamine they produced and told her, "this is the best shit I ever made." Maureen testified that she saw Baldwin three or four times that day. Matt confirmed through his trial testimony that Baldwin was at his house to produce methamphetamine.

¶7 Based upon the information provided by Krystal, law enforcement officers were able to obtain and execute a search warrant in the Schur home. Law enforcement collected chemicals and equipment from the Schurs' garage that appeared to have been used in the production of methamphetamine.

¶8 Further investigation led law enforcement to believe Baldwin was connected with a second methamphetamine lab in Great Falls. A search warrant was executed at Baldwin's house, revealing plastic tubing, marijuana, and a Wal-Mart receipt for items including Sudafed, batteries, and Coleman fuel, all items associated with the production of methamphetamine. Officers did not find methamphetamine or a methamphetamine lab in Baldwin's home.

¶9 Baldwin was charged with two felony counts of criminal production or manufacture of dangerous drugs (one for each lab), one misdemeanor count of criminal possession of dangerous drugs, one misdemeanor count of criminal possession of drug paraphernalia, and one felony count of accountability for the criminal production of dangerous drugs. At trial, Maureen, Matt, and Krystal Schur testified against Baldwin. The State also called Karin Nelson Baldwin (Karin) as a witness and showed the jury a videotaped interview in which Karin told law enforcement officers that she accompanied Baldwin on a trip to Wal-Mart in

3

Helena, where they purchased Sudafed, plastic tubing, and Coleman fuel, and attempted to purchase Sudafed at other stores.

¶10 The jury acquitted Baldwin on the charge of criminal production or manufacture of dangerous drugs related to the second lab, and the accountability charge was not submitted to the jury. Baldwin was convicted on the other three charges.

STANDARD OF REVIEW

¶11 We treat a motion to exclude an eyewitness identification as a motion to suppress. *State v. Clark*, 2000 MT 40, ¶ 14, 298 Mont. 300, ¶ 14, 997 P.2d 107, ¶ 14. Our standard of review for a district court's denial of a motion to suppress is whether the court's findings of fact are clearly erroneous, and whether those findings are correctly applied as a matter of law. *Clark*, ¶ 14.

¶12 The standard of review for evidentiary rulings is whether the district court abused its discretion. *State v. Gollehon* (1993), 262 Mont. 293, 301, 864 P.2d 1257, 1263.

DISCUSSION

ISSUE ONE

¶13 Did the District Court err when it allowed eyewitness identifications of Baldwin by Krystal and Maureen Schur?

¶14 Baldwin first argues that the District Court should have granted his motion to exclude the eyewitness identifications of him by Krystal and Maureen Schur. We apply a two-part test to determine whether an identification should be suppressed. First, we examine whether the identification procedure was impermissibly suggestive; and, if so, second, we evaluate under the totality of the circumstances whether the suggestiveness gave rise to substantial

4

likelihood of irreparable misidentification. *State v. Higley* (1980), 190 Mont 412, 421, 621 P.2d 1043, 1049.

¶15    In *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401, the United States Supreme Court set forth five factors to evaluate whether under the totality of the circumstances, the procedure gave rise to a substantial likelihood of irreparable misidentification.  The *Neil* factors are: (1) the opportunity for the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  *Neil*, 409 U.S. at 199-200, 92 S.Ct. at 382, 34 L.Ed.2d 401.

¶16    Police officers presented Krystal with a photographic lineup in which she identified Baldwin.  Baldwin argues the lineup was impermissibly suggestive for the following reasons: two of the six men depicted appeared to be Native American, whereas Baldwin is white; the other men all had darker hair than Baldwin; Baldwin had a different hairstyle than the other men; Baldwin was older than the other men; the photo of Baldwin showed his head only, whereas the other photos were of the subjects' head and shoulders; more than a month passed between the time Krystal saw Baldwin and made the identification; and Krystal did not see Baldwin for very long, did not meet him, and had no reason to pay attention to him.

¶17    We do not find Baldwin's argument persuasive.  Mere variations in appearance among photographs presented to a witness do not automatically invalidate an identification. *United States v. Robertson* (9th Cir. 1979), 606 F.2d 853, 857.  In *United States v. Nash* (9th Cir. 1991), 946 F.2d 679, 681, the Ninth Circuit found that a photo spread in which the men

depicted were of different races and had different hairstyles was not impermissibly suggestive. In *State v. Sor-Lokken* (1990), 246 Mont. 70, 803 P.2d 638, we held that a lineup in which the defendant was the only person not wearing a shirt was not impermissibly suggestive. The differences between Baldwin and the other men depicted in the lineup do not render the lineup impermissibly suggestive.

¶18 Baldwin's contentions regarding the length of time that passed before Krystal made her identification and her opportunity to observe and remember Baldwin are irrelevant here, as they apply to the second part of the *Higley* test. Because we find that the lineup in which Krystal identified Baldwin was not impermissibly suggestive, we need not proceed to the second part of the *Higley* test and employ the *Neil* factors. The District Court properly denied Baldwin's motion to exclude Krystal's identification.

¶19 The same day officers showed Krystal the photo lineup, they showed Maureen a booking photo of Baldwin. After looking at the photo of Baldwin, Maureen identified him as the man she had seen at her house on April 22, 2001. In *Higley*, we found that the practice of showing a witness only one photo was impermissibly suggestive. *Higley*, 190 Mont. at 421, 621 P.2d at 1049. We agree with Baldwin that here, as in *Higley*, it was indeed impermissibly suggestive for officers to show the witness only one photograph. Because the identification was impermissibly suggestive, we must evaluate whether under the totality of the circumstances, the procedure gave rise to a substantial likelihood of irreparable misidentification, applying the *Neil* factors as enumerated above.

¶20 Despite the fact that Maureen's identification of Baldwin was impermissibly suggestive, we are not persuaded that it should have been suppressed. Maureen had seen

6

Baldwin once or twice before the day the men made the methamphetamine in her garage, and she saw and talked to him several times that day as well. Baldwin showed her the methamphetamine and told her, "this is the best shit I ever made." He spent five to ten minutes at the dinner table with Maureen and her family that evening. At trial, Maureen testified that she was very confident in her identification of Baldwin. Only a little more than a month had passed between the date Baldwin and the others made the methamphetamine in Maureen's garage and the date Maureen made her identification. Furthermore, Baldwin points us to nothing in the record which suggests that Maureen's description of Baldwin prior to her identification of him was inaccurate. We conclude that under the totality of the circumstances, the identification procedure did not give rise to a substantial likelihood of irreparable misidentification. The District Court properly denied Baldwin's motion to exclude Maureen's identification.

## ISSUE TWO

¶21 Did the District Court err when it denied Baldwin's motion to exclude the testimony of Karin Nelson Baldwin?

¶22 Baldwin next argues that the District Court should have granted his motion to exclude the testimony of Karin Nelson Baldwin based upon spousal privilege. In Montana, spousal privilege is governed by statute. Section 26-1-802, MCA, states:

> **Spousal privilege.** A husband cannot be examined for or against his wife without her consent or a wife for or against her husband without his consent; nor can either, during the marriage or afterward, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other or to a criminal action or proceeding for a crime committed by one against the other.

Section 46-16-212, MCA, states:

> **Competency of spouses.** (1) Neither spouse may testify to the communications or conversations between spouses that occur during their marriage unless:
> (a) consent of the defendant-spouse is obtained;
> (b) the defendant-spouse has been charged with an act of criminal violence against the other; or
> (c) the defendant-spouse has been charged with abuse, abandonment, or neglect of the other spouse or either spouse's children.
> (2) Except as provided in subsection (1), a spouse is a competent witness for or against the other spouse.

¶23 Baldwin argues that Karin's testimony should have been excluded because they are married. Karin and Baldwin solemnized their marriage on October 16, 2001, after Baldwin had been charged, but before his trial on December 3, 2001. Furthermore, Baldwin argues that he and Karin had been in a common-law marriage for six years.

¶24 In denying Baldwin's motion, the District Court ruled that § 46-16-212(2), MCA, "trump[s] the general reference to spousal privilege" in § 26-1-802, MCA. The District Court cited *State v. Moore* (1992), 254 Mont. 241, 836 P.2d 604, in which we relied on § 46-16-212, MCA, to permit the testimony of a spouse. The District Court also determined that Baldwin had not established that Karin was his common-law wife.

¶25 The District Court misunderstood our holding in *Moore*. In *Moore* we did not address the interplay between § 26-1-802, MCA, and § 46-16-212, MCA; we merely discussed § 46-16-212, MCA. We wrote, "We conclude that testimony by the wife Michelle Moore, if it meets other rules of evidence, is not to be excluded on the grounds of her competency as a witness, unless it is testimony of communications and conversation between the spouses during their marriage." *Moore*, 254 Mont. at 247, 836 P.2d at 608. We did *not* address in that case whether the wife's testimony met other rules of evidence or whether her testimony

8

was, in fact, privileged. Essentially, we only reiterated subsection two of § 46-16-212, MCA.

¶26 The State urges us to examine the legislative history regarding the enactment of amendments to § 46-16-212, MCA. It is unnecessary to do so for several reasons. First, "[w]here the language of a statute is plain, unambiguous, direct and certain, the statute speaks for itself and there is nothing left for the court to construe." *State v. Roberts* (1981), 194 Mont. 189, 192, 633 P.2d 1213, 1217. The express language of § 46-16-212(1), MCA, provides that spouses may only testify to communications or conversations that occur during their marriage under certain circumstances, none of which are present in this case. More importantly, however, both the heading and subsection (2) of § 46-16-212, MCA, are clear that the statute relates to the competency of spouses to testify, not spousal privilege. We conclude that because Baldwin and Karin were married at the time of Baldwin's trial, Karin's testimony should have been excluded based upon spousal privilege, pursuant to § 26-1-802, MCA.

¶27 Having found that the District Court erred, we must next determine whether the error is harmless. In *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735, we adopted the "cumulative evidence" test to assess whether error is harmless. In *Van Kirk*, we wrote:

> In making its proof under the "cumulative evidence" standard, the State must direct us to admissible evidence that proved the same facts as the tainted evidence. Moreover, the State must also demonstrate that the *quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction.

*Van Kirk*, ¶ 44.

¶28 Baldwin argues that the admission of Karin's testimony did not constitute harmless

error. Karen was declared a hostile witness, allowing the prosecution to elicit testimony through leading questions. The jury then viewed the video of an interview police conducted of Karin in which she discussed helping Baldwin purchase the Sudafed, Coleman fuel and tubing. Baldwin contends that this testimony by Karin was the only thing connecting Baldwin to the Schur lab, other than the testimony of the Schur family, whose credibility was questionable. Maureen Schur used or possessed drugs, and Matt Schur participated in the manufacture of methamphetamine, which Baldwin argues makes their reliability suspect.

¶29    The State counters that the testimony by members of the Schur family alone was sufficient to convict Baldwin on the charges related to that methamphetamine lab. The State points out that testimony given by Krystal, Maureen, and Matt Schur was consistent. While there is evidence that Maureen Schur used or possessed drugs, and that Matt Schur participated in the manufacture of methamphetamine, no evidence exists that Krystal Schur participated in criminal activity in any way. Her testimony, the State argues, was, therefore, presumably more reliable than that of her parents. The State further argues that Karin's testimony connecting Baldwin to methamphetamine production was general, while the testimony of the Schurs was specific.

¶30    We agree with the State that the admission of Karin's testimony was harmless error. Testimony given by members of the Schur family was sufficient to support Baldwin's conviction. As we have already stated, Krystal and Maureen testified regarding the "wart remover" or "cat urine" smell coming from the garage, which is consistent with the production of methamphetamine. Both Krystal and Maureen were able to positively identify Baldwin as one of the men working in the garage that day. Maureen testified that Baldwin

10

showed her the methamphetamine they produced and told her, "this is the best shit I ever made." And finally, Matt testified that Baldwin helped produce the methamphetamine in the garage. The Schurs testified about events they observed in their home connecting Baldwin to the methamphetamine lab. While Baldwin argues the credibility of the Schurs was questionable, we agree with the State that their testimony was entirely consistent with one another, adding to their credibility.

¶31    In conclusion, we find that while the District Court erred in admitting the testimony of Karin, the error was harmless. We affirm.

/S/ JIM REGNIER

We Concur:

/S/ PATRICIA COTTER

11

Justice Jim Rice specially concurring.

¶32 I concur with the holding of the Court on all issues but must disagree with the analysis employed by the Court under Issue Two.

¶33 The Court concludes in ¶ 26 that because Baldwin and Karin were married *at the time of trial*, Karin's testimony in regard to a statement made *prior* to the solemnization of their marriage was inadmissible under the spousal privilege statute. However, this is an incorrect conclusion under Montana law. The spousal privilege does not bar admission of a statement made between two persons who were not married at the time the statement was made.

¶34 Noting the "confusing state of spousal privilege law," this Court conducted an extensive review of the law in an effort to clarify the privilege in *State v. Nettleton* (1988), 233 Mont. 308, 313, 760 P.2d 733, 737. From its survey of decisions in other states, the Court took guidance, among other sources, from *People v. D'Amato* (N.Y. Sup.Ct. 1980), 105 Misc. 2d 1048, 430 N.Y.S.2d 521, 522, which held that:

> The statutory privilege covers only those private exchanges which "would not have been made but for the absolute confidence in, and induced by, the marital relationship." [Citation omitted.]

*See Nettleton*, 233 Mont. at 316, 760 P.2d at 738.

¶35 Based thereon, the Court ruled that a "full and workable definition of the threshold for communications between spouses deemed privileged would thus require two elements," as follows:

> First, the communications must be utterances and other expressions intended to convey a message from one spouse to another. Second, the message must be intended by the communicating spouse to be confidential in that it was conveyed in reliance on the confidence of the marital relationship.

12

*Nettleton*, 233 Mont. at 317, 760 P.2d at 739.

¶36    Karin's testimony was not made inadmissible by virtue of the fact that she and Baldwin were married at the time of trial. To the contrary, the inquiry centers on their status at the time the contested statement was made. If they were not married at that time, then the statement could not "convey a message from one *spouse* to the other" and could not have been "conveyed *in reliance* on the confidence of the *marital relationship.*" *Nettleton*, 233 Mont. at 317, 760 P.2d at 739 (emphasis added). Because the solemnization of the marriage had not occurred at the time the statement was made, Karin's testimony about the statement was not barred thereby.

¶37    The issue then shifts to the validity of Baldwin's claim that a common law marriage existed between he and Karin at the time the statement was made. At trial, the common law marriage issue rose as an evidentiary objection during Karin's testimony, at which time the jury was excused and the parties offered very brief testimony to the District Court concerning Baldwin and Karin's relationship. The direct and cross-examination produced testimony that Baldwin and Karin had not shared finances or income tax returns during their relationship, had been separated for a year prior to the solemnization, that Baldwin had an intervening relationship with another woman, and that the parties decided to marry by solemnization because, according to Karin, "I wanted to get married. We've been wanting to get married a long time." Given the brief testimony offered in regard to this issue, I would conclude that the District Court's evidentiary ruling that no common law marriage existed was founded upon substantial evidence, and therefore, Karin's testimony concerning the statement was not barred by the spousal privilege.

13

¶38    I concur in affirming the District Court.

/S/ JIM RICE

Chief Justice Karla M. Gray and Justice W. William Leaphart join in the concurring opinion of Justice Rice.

/S/ KARLA M. GRAY

/S/ W. WILLIAM LEAPHART