No. 83-140

IN THE SUPREME COURT OF THE STATE OF MONTANA

1983

_____

IN RE THE MARRIAGE OF

LINDA H. SARSFIELD,

       Petitioner and Appellant,

  and

MICHAEL J. SARSFIELD,

       Respondent and Respondent.

_____

APPEAL FROM: District Court of the Second Judicial District,
In and for the County of Silver Bow,
The Honorable Arnold Olsen, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Daniel R. Sweeney, Butte, Montana

    For Respondent:

        Deirdre Caughlan, Butte, Montana

_____

Submitted on Briefs: August 4, 1983

Decided: October 27, 1983

Filed: OCT 27 1983

_Ethel M. Harrison_
_____
Clerk

Mr. Justice L.C. Gulbrandson delivered the Opinion of the Court.

Linda Sarsfield appeals from an order of the District Court of the Second Judicial District, Silver Bow County, in favor of her former husband, Michael Sarsfield, modifying a prior child custody decree by transferring custody of the former couple's minor children from Linda to Michael. For the reasons stated below, we reverse the order of the trial court and remand for additional proceedings consistent with this opinion.

Michael and Linda were married in November, 1970, and remained together for approximately nine years. Two children were born of this union: Michael John, now twelve, and Sarah, now four. Husband Michael apparantly left the family home in 1979 shortly before Sarah's birth. Linda filed a petition for dissolution of the marriage in November, 1980, and sought permanent custody of the children and child support. Michael agreed to the custody proposal, and after negotiations between the parties over child support and property were completed, the court issued a final decree of dissolution on February 6, 1981. Linda received custody, and Michael was allowed liberal visitation rights. Michael moved into a mobile home located next door to the family home. He remarried sometime later, and he and his new wife had a baby girl in 1982.

The immediate dispute began nearly a year after the entry of the divorce decree and custody order. On April 16, 1982, Michael filed a petition to modify the custody decree. The petition alleged that the children had been left alone

on several occasions in the care of M.M., whom Michael believed to be a child molester. The petition further alleged that Linda and M.M. were planning to marry, and that the homelife of the children seriously endangered their physical, mental, moral, and emotional health. Michael sought temporary and permanent custody of the children, maintaining that the benefits of a transfer would outweigh any disadvantages. He also filed a motion requesting that the court conduct an in camera inspection of all records and documents in possession of the Department of Social & Rehabilitation Services (S.R.S.) relating to abuse of M.M.'s daughter.

In her answer, Linda admitted her impending marriage to M.M., but denied that the children were in any danger and that a change in custody would be in their best interests. She also filed a counter-petition, contending that Michael's petition was vexatious and constituted harrassment.

Four separate hearings were held concerning the proposed modification. The first, conducted May 7th, 1982, focused primarily on the allegations concerning M.M. and the supposed threat to the Sarsfield children. Michael testified in support of his petition, as did his new wife, Penny. M.M. was called as a hostile witness, but the bulk of testimony concerning M.M.'s sexual proclivities came from M.M.'s former wife, who appeared voluntarily at Michael's request. Dr. Janet Allison, a psychologist, also testified on matters concering sexual abuse of children. Linda took the stand to challenge the allegations of Michael and his witnesses. Her minister, Dwayne Miller, testified on her behalf. At the conclusion of the hearing, the court ordered

that the children be placed in Michael's custody for two weeks, and then be returned to Linda for two weeks. The court further ordered that public welfare authorities investigate the home environments of Michael and Linda while the children were in their respective custody. Finally, the court ordered that M.M. was not to be allowed in the presence of the Sarsfield children, and granted Michael's motion for a court inspection of the S.R.S. file on M.M.'s daughter.

The second hearing, held May 28th, dealt with the alleged presence of M.M. in Linda's home in violation of the court's May 7th order. Testimony was taken from Michael, Linda, and members of their respective families, as well as M.M. Upon conclusion of the hearing, Michael was granted temporary custody of the children. The third hearing, held June 18th, consisted primarily of testimony from Dave Evans, the social worker who investigated Michael's and Linda's home environments. Evidence was also taken from Michael and his mother, Olive, as well as Linda and Pastor Miller, and Ronald Kautzman, Michael John Sarsfield's principal at the school he attended while under his mother's custody. A separate colloquy was held with Michael John on September 28th in the presence of counsel, wherein the court interviewed the boy concerning his current family life and that of his sister Sarah.

The court entered its findings and conclusions November 29th, 1982. Specifically, the court found that the children's physical, mental, moral and emotional health were seriously endangered by the association of M.M. with Linda Sarsfield, because of M.M.'s status as a child molester, and

that there was a potential for future harm if the children remained in Linda's custody. The court further found that Linda's conduct was, under the circumstances, "grossly negligent and irresponsible." The court concluded that a transfer of custody to Michael was in the best interests of the children, in that the advantages of transfer outweighed the disadvantages. Linda was granted visitation rights. A motion to amend the findings and conclusions was promptly filed. A hearing was had, and the motion to amend was denied. Notice of appeal was timely filed.

Linda raises three issues on appeal:

(1) Whether the trial court erred by failing to dismiss Michael's petition for modification for failure to meet the jurisdictional prerequisites of Section 40-4-219, MCA?

(2) Whether, in light of the evidence and the statutory requirements concerning changes in the circumstances of the children, the court erred in modifying the original custody decree?

(3) Whether the trial court erred in sustaining an objection to hearing testimony concerning allegations of Michael's fitness to be granted custody, where the allegations involved matters occuring before and after the original custody decree?

Once again, this Court is called upon to assume the unenviable role of King Solomon and render judgment between parents warring over the future of their children. This sad and difficult task is made even more vexing because of the unique facts of this case. Many of the evidentiary matters raised by the parties have not yet been addressed by the

appellate courts of sister states, especially those that, like Montana, have adopted Uniform Marriage and Divorce Act provisions respecting modification of child custody decrees. Thus, we set out, to an extent, upon unchartered waters, although our prior experience with considering modified custody decrees does offer at least one star upon which we may rely when plotting our course.

The polestar that guides our discretion in this modification case is mapped out carefully in certain provisions of Section 40-4-219, MCA:

> "40-4-219. Modification. (1) The court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree or that were unknown to the court at the time of entry of the prior decree, that a change has occurred in the circumstances of the child or his custodian and that the modification is necessary to serve the best interest of the child. In applying these standards the court shall retain the custodian appointed pursuant to the prior decree unless:
>
> ". . .
>
> "(c) the child's present environment endangers seriously his physical, mental, moral, or emotional health and the harm likely to be caused by a change of environment is outweighed by its advantages to him."

Subsection (c) is a jurisdictional prerequisite to determining whether modification of the prior decree is in the best interests of the child. In other words, the district court "is powerless to entertain . . . considerations [of best interests and changes in circumstances] if it has not found at the outset [that] the child's welfare [is] 'endangered seriously' by the present custody arrangement." Gianotti v. McCracken (1977), 174 Mont. 209, 214, 569 P.2d 929, 932. See also In re the

Custody of Dallenger (1977), 173 Mont. 530, 534, 568 P.2d 169, 171-2. This prerequisite codifies the basic policy behind the modification statute: a presumption in favor of custodial continuity. Dallinger, supra. Thus, the party seeking modification bears a heavy burden to prove the circumstances necessary for modification. Groves v. Groves (1977), 173 Mont. 291, 298-99, 567 P.2d 459, 463.

The sine qua non of appellant's case is a satisfactory showing that the trial court proceeded without regard to the evidence relied upon to support the change in custody. We emphasize, however, that the findings and conclusions of the court will not be disturbed if they are supported by substantial, credible evidence. Sawyer-Adecor Intern., Inc. v. Anglin (Mont. 1982), 646 P.2d 1194, 39 St.Rep. 1118.

Appellant's first issue for review goes to the trial court's decision not to dismiss Michael's petition following presentation of his case-in-chief at the first hearing. Her principal objections are that there was no evidence pointing to actual serious danger to the minor children during her association with M.M., and that the testimony of M.M.'s former wife concerning M.M.'s history of child sexual abuse should not have been admitted into evidence.

We first consider the admissibility of the former wife's testimony. M.M. was subpoened by Michael to testify as a hostile witness, but he invoked his constitutional privilege against self-incrimination and did not answer questions concerning allegations that he had sexually abused his daughter a few years prior to the immediate case. The trial court protected him from any incriminating questions posed by Michael's attorney. After he was dismissed,

-7-

however, M.M.'s former wife was called as a witness. She testified that her daughter had been removed from the family home because she had been sexually abused by M.M. She had never witnessed any incidents of abuse, but her husband had admitted the incidents to her. M.M. indicated to his wife that, for at least six years prior to his admission, he had "used various items, his hands, pokers, various instruments of that sort to induce her [the daughter] in various ways" on several occasions. No criminal charges were filed against M.M., but the daughter was removed by authorities and underwent treatment for emotional problems connected with the abuse.

After her return from therapy, M.M. admitted to his wife that he had sexually molested the girl again. The daughter was removed to a childrens' home where she continues to undergo therapy. According to the former wife, M.M. is not allowed to see the girl without others present. He admitted his problem to counselors, but has apparently not committed any deviant acts since the last incident with his daughter.

Linda's attorney objected to the entire line of testimony on grounds that it was based solely on privileged communications between M.M. and his former wife during the course of their marriage. In the alternative, counsel objected to the testimony as inadmissible hearsay. The trial court overruled the objection. We find no error in the court's ruling.

The privilege against examination concerning inter-spousal communications is set forth in Section 26-1-802, MCA:

"Spousal privilege. A husband cannot be examined for or against his wife without her consent or a wife for or against her husband without his consent; nor can either during the marriage or afterward, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply to a civil action or proceeding by one against the other or to a criminal action or proceeding for a crime committed by one against the other."

Michael argues that we have generally abrogated this privilege, citing Matter of J.H. (Mont. 1982), 640 P.2d 445, 39 St.Rep. 267. Appellant notes correctly, however, that Matter of J.H. was concerned solely with the spousal privilege as it pertains to parties to an action, and is therefore not applicable to revealing communications between non-parties, as is the situation is in the case before us. Nevertheless, we think appellant is focusing on an irrelevant aspect of the privilege when asking this Court to throw out the evidence.

We have previously recognized that the purpose of the spousal privilege is to protect the sanctity of the marriage and home. Matter of J.H., supra, 640 P.2d at 447, 39 St.Rep. at 269; State v. Taylor (1973), 163 Mont. 106, 119, 515 P.2d 695, 703. This privilege, however, is subject to the maxim that, when the reason for a rule ceases to exist, so then should the rule. See Section 1-3-201, MCA. Thus, in Matter of J.H., we held that once a family member has been sexually abused, the sanctity of the home and therefore the reason for the rule are simultaneously destroyed, 640 P.2d at 447, 39 St.Rep. at 269, and that a mother could testify about her husband's sexual abuse of their son in a child neglect proceeding, where the father was a party to

the action. In the immediate case, the sexual abuse of M.M.'s daughter decidedly contributed to the destruction of the family home and M.M.'s marriage. Under the circumstances, we believe the privilege concerning communications about this abuse died with the marriage, and we are disinclined to invoke the privilege even though M.M. and his former wife are not parties to this custody battle.

Additionally, Professor Wigmore has criticized the spousal privilege in situations involving non-parties on other grounds:

> "[T]he exclusion of a wife on the ground that her testimony may reveal his misconduct, and thus 'tend' to charge [or incriminate] him, rests on the assumption, false in fact, that her testimony on the stand would in any sense be a revelation, an unsealing of that which was secret. Nothing prevents her from revealing her knowledge out of court; in most instances she has in fact done so. It would be mere hypocrisy to sanction her silence on the stand on the pretext that the husband was thus really safeguarded from her disclosure."

8 J. Wigmore, Evidence Section 2234 (McNaughton rev. 1961). Clearly, the subject of the supposedly privileged communications had been revealed to welfare authorities and, as it turned out later, to M.M.'s "counselor," Pastor Miller. We agree with the trial court that the testimony of M.M.'s wife was not protected by the spousal privilege under these facts.

Neither the trial court nor the parties have fully explored appellant's suggestion that the testimony was inadmissible as hearsay, whether or not the spousal privilege applied. We find that the evidence would be admissible as a statement against interest, an exception to the hearsay rule. See Rule 804(b)(3), Mont.R.Evid. Hearsay

testimony admitted under the enumerated subsections of Rule 804 cannot be admitted unless the declarant is "unavailable" for trial. Exemption from testifying on grounds of privilege is one form of "unavailability." Rule 804(a)(1), Mont.R.Evid. A witness' claim of the privilege against self-incrimination is generally regarded as a sufficient ground of unavailability to warrant reception as a statement against interest of a prior statement or communication made by him. See generally Annot., 43 ALR3d 1413 (1972). In this case, M.M.'s communications to his wife were "so far tended to subject him to . . . criminal liability . . . or to make him an object of hatred, ridicule, or disgrace, that a reasonable man in his position would not have made the statement[s] unless he believed [them] to be true." See Rule 804(b)(3), Mont.R.Evid. There being circumstantial guarantees of trustworthiness, we conclude that the communications were admissible.

We next examine appellant's argument that Michael and his witnesses presented no evidence of an actual danger to the children while in the wife's custody. Indeed, there was nothing to suggest that either of the children, especially the girl Sarah, who was probably the most susceptible to harm, had ever been physically molested. Nevertheless, we recognize that child abuse presents a special problem with respect to proof of danger. Specifically, we must decide whether or not the probability of danger is great enough to give the trial court jurisdiction over the proposed modification. See Section 40-4-219(1)(c). No other appellate court has dealt with this particular problem, so we must rely solely on a reasonable construction of the

existing statute and the available evidence.

During the initial hearing, the trial court heard evidence concerning M.M.'s record as a sexual molester. In addition, Dr. Allison, a psychologist qualified to discuss child sexual abuse, testified concerning the causes of this deviant behavior and treatment methods. She testified that child molesters cannot be cured, but can only be controlled. In short, the molester must be carefully monitored, especially in the sensitive situation when children are present. Although Dr. Allison had not examined M.M. personally, she indicated that if a previous offender like M.M. were placed in a family environment like Linda's, the risk of reoccuring sexual abuse, especially of the young girl, would be "rather high." She reiterated this concern later in her testimony, believing that there would be a substantial risk involved in placing an admitted child molester in a family situation. She also noted that Montana does not have a comprehensive treatment program for offenders.

Given the testimony described above, we cannot say that the trial court erred by not dismissing the petition after presentation of Michael's case-in-chief. There was substantial evidence before the court to suggest that a potentially serious situation existed with respect to M.M.'s association with Linda and her children. Appellant insists, however, that without proof of "actual danger," the jurisdictional pre-requisites of Section 40-4-219(1)(c) have not been met. We find it difficult to accept this line of reasoning under these facts. Appellant is surely not maintaining that until one of the Sarsfield children is

sexually assaulted, a trial court cannot consider altering the terms of an initial custody decree.  Other courts interpreting statutory provisions similar to Section 40-4-219(1)(c) have concluded that, even in less serious situations than sexual abuse, the _potential_ for or _probability_ of serious harm is sufficient to invoke the trial court's jurisdiction to contemplate modification of a custody decree.  See e.g., In re Marriage of Padiak (1981), 101 Ill.App.3d, 427 N.E.2d 1372 (testimony by psychiatrist that child's mental, moral and emotional health was potentially endangered by custodial parent's social behavior held sufficient to justify consideration of modification).

In summary, we will not interpret the provisions of the modification statute so narrowly as to prevent trial courts from assuming jurisdiction over modification petitions where substantial, credible evidence of a potential danger is presented by a petitioner during the case-in-chief.  Such is the case here, and the trial judge did not abuse his discretion by failing to dismiss the complaint.

With respect to the second issue for review, appellant must again point to a lack of substantial, credible evidence to warrant further consideration of the proposed modification.  We conclude that, in addition to testimony presented by Michael and his witnesses at the first hearing, subsequent testimony and information brought to the attention of the court provided substantial, credible evidence of a change in circumstances so as to warrant consideration of modifying the prior decree.  At the May 7th hearing, Linda testified that she knew of the allegations

-13-

about M.M. nearly two months before Michael filed his petition, and that she was aware that M.M. was being counseled about his problem by his minister, Dwayne Miller. At the May 28th hearing, the court heard testimony that M.M. had been in the presence of the Sarsfield children on at least one occasion immediately following the May 7th hearing, contrary to the court's order that he stay away from the children. Finally, at the June 28th hearing, the court indicated that it had conducted an in camera inspection of the S.R.S. file on M.M.'s daughter, and then entered portions of the file into evidence for further consideration. In addition, the court heard testimony from Olive Sarsfield, Michael's mother, that Linda had threatened not to allow her to see the grandchildren again if she (Linda) was successful in the custody battle, and that Olive was "in league with the devil" because of her support for Michael's petition.

To counter this evidence, appellant points to her statements that the impending marriage to M.M. had been postponed, and eventually that the relationship was severed because of her overriding interest in the children. She further testified that she had assurances from Pastor Miller that M.M. was "O.K.," and that the testimony of M.M.'s wife was motivated by jealousy because she wanted M.M. back. Linda also relies on the remarks of Pastor Miller, who contended that M.M.'s religious conversion had brought him down the path to solving his sexual problems, and that as a minister and a counselor to M.M., he would not have sanctioned the impending marriage had he not been convinced that M.M.'s problems had been solved. Linda also disputes

-14-

the allegation that M.M. was in the presence of her children after the May 7th hearing, as several members of her family testified that the children were not in the home when M.M. was there. Linda also renews earlier arguments that the children were never physically harmed by M.M., and that Michael, who lived next door for much of the time of the hearing, was in a position to deal with any problems if they arose.

The findings of a trial judge will not be disturbed on appeal where they are based on substantial though conflicting evidence, unless there is a clear preponderance of evidence against such findings. In re Marriage of Schwartz (Mont. 1979), 602 P.2d 175, 176-77, 36 St.Rep. 1980, 1981. It is not the function of this Court to resolve conflicts in the evidence. Weyler v. Kaufman (1981), 196 Mont. 132, 136, 638 P.2d 393, 396. The trial judge has the superior advantage of observing the demeanor and credibility of the witnesses, Brooks v. Brooks (1976), 171 Mont. 132, 134, 556 P.2d 901, 902, and we will not dispute his or her particular resolution of conflicting statements unless the evidence clearly preponderates against the findings. Here, many of appellant's arguments involve conflicting evidence. The trial court had substantial evidence before it to conclude that M.M. was a potential threat to the safety of the Sarsfield children, and had apparantly defied the court's May 7th order to stay away from the children. Obviously, the trial judge was not convinced by the testimony of Linda, members of her family, or Pastor Miller (who was not qualified as an expert on sexual abuse), and we refuse to assign a different weight to their collective

testimony.

In summary, we find no error in the trial court's findings with respect to the potential danger raised by M.M.'s association with Linda and Linda's conduct once she knew or had reason to know of M.M.'s past. We note that during the June 18th proceedings, there was testimony that M.M. had left the community and therefore inferentially posed no threat to the Sarsfield children. Nevertheless, during the September 28th colloquy, Michael John Sarsfield indicated that he usually saw M.M. at the same church attended by Linda, Michael John, and Sarah when Linda had visitation rights, and that Linda would speak to M.M. at that time. The court could thus reasonably conclude that Linda's association with M.M. had not ended, even if their former marriage plans were in limbo.

Having concluded that the potential danger to the children was a sufficient change in circumstances to justify modifying the prior decree, the trial court was still bound to consider the best interests of the children before deciding that transfer of custody to Michael was mandated. Appellant's third issue goes to the unwillingness of the trial court to hear evidence concerning allegations about Michael's behavior before the initial decree was entered in 1981 and shortly thereafter. We conclude that the failure to allow this evidence into the record was reversible error.

Although the social worker, Dave Evans, testified that Michael's new home life was suitable for raising the children, and although Michael John indicated during the September 28th colloquy that he and Sarah were happy living with their father, his new wife, and their newborn child,

Linda attempted to put in evidence concerning Michael's moral behavior prior to and shortly after the dissolution of their marriage. Linda did testify at the early hearing that Michael did not relate well to the children, and had "deserted" the family in 1979, but the evidentiary problem arose during the June 18th hearing when the court sustained an objection to having Linda elaborate on the question of Michael's moral conduct and fitness to raise children.

We disagree with respondent that Linda's argument is a twelfth-hour attempt to convince the court that modification of the decree was unnecessary. In her answer to Michael's petition, Linda generally denied several averments made by Michael, including the ones that he could provide "a safe and stable home for the children," and that at the very least, temporary custody was "in the best interests of the children." By denying these averments, Linda put into issue Michael's fitness as a custodial parent, and her testimony on this issue should not have been summarily refused.

Section 40-4-219(1) specifically contemplates that:

> "[t]he court shall not modify a prior custody decree unless it finds, upon the basis of facts that have arisen since the prior decree <u>or that were unknown at the time of entry of the prior decree</u>, that a change has occured in the circumstances of the child or his custodian <u>and</u> that the modification is necessary to serve the best interest of the child." (emphasis added)

Clearly, the statute requires the trial court to consider post-decree facts, as well as pre-decree facts unknown to the trial court at the time the decree was entered, in determining both the "change in circumstances" and the "best interests" requirements. Respondent Michael argues that, because there was no issue as to Michael's fitness during

consideration of the first decree, the trial court is automatically precluded from probing that issue in a later modification hearing. This is inconsistent with a fair reading of the statute and our decision in Matter of Custody of R.L.S. (Mont. 1981), 632 P.2d 703, 38 St.Rep. 1328, wherein we held that it was reversible error for a trial court to limit evidence in a custody dispute to post-decree facts.

Whether there was no hearing prior to entry of the initial decree, as in Custody of R.L.S., or whether the fitness of the parent seeking modification was not at issue prior to entry of the initial decree because that parent did not challenge his spouse's demand for custody, the primary concern of the trial court is still the welfare of the child. The court cannot satisfy this concern if it consciously or unconsciously avoids facts about the parent seeking modification that took place prior to entry of the initial decree. Contrary to the thrust of Michael's argument, Linda's testimony concerning his conduct or behavior prior to entry of the first decree may involve "facts . . . unknown to the court at the time of entry" within the scope of Section 40-4-219, and this testimony should not have been prohibited. See also Boggs v. Boggs (1978), 65 Ill.App.3d 965, 383 N.E.2d 9; In re Rankin (1969), 76 Wash.2d 533, 458 P.2d 176.

Accordingly, the judgment of the district court is reversed and the case is remanded for further proceedings. Upon remand, the trial court shall take testimony relating to facts or allegations that have arisen since the prior decree or that were unknown to the court at the time of

entry of that decree concerning Michael's fitness to obtain custody. The trial court shall decide whether its findings with respect to Michael's fitness, considered in conjunction with its earlier findings concerning the changes in circumstances, still warrant modification of the initial decree by placing the Sarsfield children in Michael's custody.

_____
Justice

We concur:

_____
Chief Justice

_____

_____
Justices