FILED

03/14/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0750

DA 14-0750

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 61

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

JOSEPH D. FORSYTHE,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                      In and For the County of Yellowstone, Cause No. DC 14-123
                      Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Chad Wright, Chief Appellate Defender, Jennifer Hurley, Assistant
                Appellate Defender, Helena, Montana

        For Appellee:

                Timothy C. Fox, Montana Attorney General, Mardell Ployhar,
                Assistant Attorney General, Helena, Montana

                Scott D. Twito, Yellowstone County Attorney, Benjamin Halvorsen,
                Deputy County Attorney, Billings, Montana

Submitted on Briefs:  December 7, 2016

Decided:  March 14, 2017

Filed:

                                               Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 In November 2013, Joseph Forsythe and his wife, Giana, had a violent physical altercation after which Forsythe was charged with Partner/Family Member Assault (PFMA). While detained and under a "no contact" order, Forsythe sent letters to Giana directing her to provide false testimony regarding the incident. Giana provided the letters to the authorities. Thereafter the State charged Forsythe with felony tampering with a witness. A jury found Forsythe guilty of both tampering and PFMA. Forsythe appeals his sentence and evidentiary rulings issued by the Thirteenth Judicial District Court, Yellowstone County, during and following his trial. We affirm.

## ISSUES

¶2 We restate the issues on appeal as follows:

¶3 Did the District Court err in holding that the letters Forsythe sent to Giana were protected by spousal privilege?

¶4 Did the District Court abuse its discretion by allowing a lay witness to testify regarding handwriting samples?

¶5 Did the District Court impose an illegal sentence by ordering Forsythe to pay a $20 information technology surcharge?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6 In November 2013, Joseph Forsythe was charged in the Billings Municipal Court with misdemeanor Partner/Family Member Assault—Second Offense following a violent physical altercation with his wife, Giana, during which she was seriously injured. While

2

confined at the Yellowstone County Detention Facility (YCDF) and under a "no contact" order, Forsythe and Giana wrote letters to one another. Giana received, at a minimum, five letters from Forsythe dated between November 15, 2013, and January 24, 2014. One of these letters unequivocally instructed her to tell the authorities that her injuries were the result of her falling and hitting herself on a cabinet. He further directed her to refuse to testify against him and to claim she had a mental illness that would preclude her from testifying.

¶7 Giana gave the letters to the Billings City Attorney's Office. The City Attorney moved to dismiss the Billings Municipal Court case without prejudice and, in February 2014, Forsythe was charged with one count of felony tampering with a witness[1] and one count of misdemeanor PFMA in the Thirteenth Judicial District Court. In May 2014, the State filed notice of its intent to designate Forsythe a persistent felony offender (PFO) on the grounds that less than five years had elapsed between Forsythe's 2014 felony tampering charge and his 2011 release from parole on a charge of felony residential burglary.

¶8 In June 2014, Forsythe filed a motion in limine seeking to prevent the letters he sent to Giana from being admitted into evidence in his tampering case. He argued that the letters constituted confidential communication between spouses and were protected

[1] Section 45-7-206, MCA, defines tampering with a witness and provides in part:
(1) A person commits the offense of tampering with witnesses and informants if, believing that an official proceeding or investigation is pending or about to be instituted, the person purposely or knowingly attempts to induce or otherwise cause a witness or informant to:
(a) testify or inform falsely; [or]
(b) withhold any testimony, information, document, or thing. . . .

by spousal privilege under § 26-1-802, MCA. The State countered that the letters to Giana were not within the scope of spousal privilege because the letters were intended to intimidate and harass Giana into silence.

¶9 The court conducted a motion hearing on July 30, 2014, at which law enforcement officer Brad Tucker, who was noticed as a witness on June 23, testified as to his handwriting analysis background and experience and that he had testified at previous unrelated trials as an expert in this field. He also compared letters received by the presiding judge from Forsythe with the letters Giana received and concluded they were all written by the same person. Forsythe objected to Tucker's testimony on foundation grounds and the State's failure to notice Tucker as an expert. The court overruled the objections, noting that Forsythe's handwriting was extremely distinctive and could be effectively compared by the judge, juror, or a lay witness. The court admitted the letters into the record. Following the hearing, the District Court issued its ruling from the bench preliminarily granting Forsythe's motion in limine. The court's subsequent written order informed the State that it would have to rely on "other evidence, other than the testimony of [Giana], to establish the elements of [witness tampering]."

¶10 During the pre-trial conference for Forsythe's August 11, 2014 jury trial, the District Court ruled that Giana could testify that she received letters from Forsythe but she could not testify as to the contents of those letters because to do so would violate spousal privilege as it applied to the witness tampering charge. Following Giana's trial testimony, the jury heard the same handwriting analysis testimony from Tucker as the District Court had heard at the July 30 hearing. The testimony was intended to establish

4

that Forsythe had written the letters to Giana in violation of § 45-7-206, MCA, i.e., the tampering statute. The State, however, did not offer him as an expert in this case; consequently, he offered opinion testimony as a lay witness. Forsythe objected to Tucker's authentication testimony arguing that because the State had not noticed Tucker as an expert Tucker's lay witness testimony did not satisfy M. R. Evid. 901(b)(2) (Rule 901). Following Tucker's testimony, the court permitted the State to introduce the letters into evidence in the tampering case. At the time of the admissibility ruling, Forsythe objected solely on the grounds of spousal privilege. The jury found Forsythe guilty of both witness tampering and PFMA.

¶11 In January 2015, the District Court issued its Judgment, committing Forsythe to the Montana State Prison for fifteen years with five years suspended for the tampering charge and sentencing him to YCDF for one year for the PFMA. The PFMA sentence was ordered to run concurrently with the tampering sentence. Forsythe received credit for the time served in pre-trial incarceration and was designated a PFO. He was subject to numerous terms and conditions, including completing an anger management program and other behavioral modification programs.

¶12 Forsythe filed a timely appeal.

## STANDARD OF REVIEW

¶13 This court reviews a district court's evidentiary decisions for an abuse of discretion. *State v. Pingree,* 2015 MT 187, ¶ 9, 379 Mont. 521, 352 P.3d 1086. The determination of whether evidence is relevant and admissible is within the sound

5

discretion of the trial judge and will not be overturned absent a showing of abuse of discretion. *State v. Levanger*, 2015 MT 83, ¶ 7, 378 Mont. 397, 344 P.3d 984.

## DISCUSSION

¶14 *Did the District Court err in holding that the letters Forsythe sent to Giana were protected by spousal privilege?*

¶15 Forsythe claims his letters are confidential marital communication and thus protected by the spousal privilege doctrine. The doctrine of spousal privilege originated in English common law and was first recognized by the United States Supreme Court in *Stein v. Bowman*, 38 U.S. 209, 10 L.Ed. 129 (1839). Most states subsequently codified the privilege and Montana enacted its first spousal privilege law in 1867. *State v. Nettleton*, 233 Mont. 308, 313, 760 P.2d 733, 736 (1988). The central principle behind the privilege is "to protect the sanctity of the marriage and home." *In re Marriage of Sarsfield*, 206 Mont. 397, 406, 671 P.2d 595, 600 (1983) (citations omitted). However, we also noted in *Sarsfield* that the privilege is subject to the maxim that "[w]hen the reason of a rule ceases, so should the rule itself." Section 1-3-201, MCA; *Sarsfield*, 206 Mont. at 406, 671 P.2d at 600.

¶16 While the principle behind the privilege remains, the law codifying it has evolved considerably since 1867 and the privilege is not as far-sweeping as it once was. Exceptions have arisen, one of which provides that threatening communications— whether oral or written—are not privileged or protected and should not be excluded from evidence based upon the spousal privilege. *Nettleton*, 233 Mont. at 317, 760 P.2d at 739; *State v. Edwards*, 2011 MT 210, ¶ 19, 361 Mont. 478, 260 P.3d 396.

6

¶17 The applicable spousal privilege statute, § 26-1-802, MCA, provides:

> Neither spouse may, without the consent of the other, testify during or after the marriage concerning any communication made by one to the other during their marriage. The privilege is restricted to communications made during the existence of the marriage relationship and does not extend to communications made prior to the marriage or to communications made after the marriage is dissolved. The privilege does not apply to a civil action or proceeding by one spouse against the other or to a criminal action or proceeding for a crime committed by one spouse against the other or against a child of either spouse.

¶18 Forsythe asserts that the District Court was correct when it issued its preliminary ruling granting his motion in limine and finding that the letters Giana received while Forsythe was detained at the YCDF were "privileged spousal communications." He continues, however, that the court "erred . . . in how it subsequently applied the privilege statute to testimony and evidence on the tampering charge."

¶19 Forsythe contends that the court incorrectly ruled that the letters were *not* covered by the spousal privilege because they were written communications rather than oral testimony. In other words, the District Court correctly concluded that Giana could not orally testify about the spousal communications but it erred when it admitted the letters through a third-party lay witness "merely because they took a written form." Forsythe further asserts that admitting the testimony of a lay witness unfamiliar with his handwriting to authenticate the letters violated Rule 901.

¶20 Lastly, Forsythe maintains that the letters contained no threats to Giana and the State produced no evidence that Giana felt fearful or threatened. Rather, and relying on *Nettleton*, he claims that the letters were communications (1) "'intended to convey a message from one spouse to the other,' and (2) the message was 'intended by the

7

communicating spouse to be confidential in that it was conveyed in reliance on the confidence of the marital relationship.'" *Nettleton*, 233 Mont. at 317, 760 P.2d at 739. As such, they were privileged spousal communications.

¶21 The State acknowledges that the District Court's reasoning for admitting the letters was erroneous and that written spousal communications are protected by the privilege. However, the State, also relying on *Nettleton*, maintains that the court did not err in admitting these letters because the content of the communications was intimidating and intended to influence Giana's participation in the case, and therefore were not protected spousal communications. *Nettleton*, 233 Mont. at 317, 760 P.2d at 739.

¶22 Additionally, the State asserts that the statutory language in § 26-1-802, MCA—"[t]he privilege does not apply to . . . a criminal action or proceeding for a crime committed by one spouse against the other"—should apply to the charge of tampering with a witness when the witness is the spouse. It acknowledges that while tampering with a witness typically is an offense against the public administration, it is also an offense committed against Giana in this case. As such the statute supports a finding that the letters are not protected by the privilege.

¶23 Unfortunately, the District Court, in its order granting Forsythe's motion in limine, did not provide a detailed legal rationale for its decision. To the extent, as argued by the parties, that the court drew a distinction between written and oral communications and concluded that written communications are not protected by spousal privilege, this was error.

8

¶24    Having determined that the written letters were subject to protection under the privilege, we next turn to whether the letters contained intimidating and threatening language, and therefore were not communicated "in reliance on the confidence of the marital relationship." *Edwards*, ¶ 19.  We acknowledge that many of the letters contain terms of endearment and repeated professions of love and that we observed no overt or direct threats of violence.  However, we conclude that, based upon the underlying relationship of the persons involved, direct and overt threats of violence are not always necessary to instill fear, intimidation, or a sense of physical vulnerability.  As an example, Forsythe wrote in his letter dated January 24, 2014, the last letter Giana turned over to the prosecuting attorney:

> You need to seriously get a hold of yourself, like as of this letter and stop listening to that punk-ass D.A.  He is our enemy . . . he gets paid to fuck peoples lifes [sic] up.  He is playing you for a fuckin dummy, he wants you to turn against me . . . and it sounds like it's working.  I've got this case beat and they know it, and now the fucks are trying anything including using you.  The only way that I can lose is if you <u>testify</u> against <u>me</u> so get a fucking hold of yourself . . . now!  You give up so fuckin easy. . . .  You need to be patient.  This is not fuckin Burger King, you need to calm the fuck down before you fuck me for good. . . .  Now, I'm coming home soon so do as I ask, and I mean it.

¶25    Forsythe concluded the letter by telling Giana he loved her "dumb ass - so be good."  We note that Forsythe adopted an angrier and more threatening prose in this letter than in his previous letters.

¶26    In addition to an intimidating posture in Forsythe's last letter, a few of the letters attempted to suborn perjury by instructing Giana to lie to the authorities about their communications and the manner in which she was injured.  For example, Forsythe made

9

the following statement in one of his letters: "Just try to talk to my public defender, I'm saying that we fell down together. And she hit herself on the cabinet, thats [sic] how she got her marks."

¶27 It is apparent from these letters that Forsythe's goal, through his written instructions to his wife, was to intimidate her into withdrawing her allegations against him. Forsythe's letters are a written embodiment of the psychological manipulation and control that inheres in an abusive relationship—escalating to a threat that he is "coming home soon" where he will have physical access to his wife again. She knows what is coming if that happens. In the context of such a relationship, these communications plainly are a threat and are damaging to, rather than preserving of, the sanctity of the marriage.

¶28 First, we note it is not inherently wrong or unlawful for one spouse to encourage the other spouse to exercise his or her spousal privilege. The wrongdoing occurs when one spouse encourages or persuades the other spouse to exercise the privilege *for* wrongful purposes such as suborning perjury or *through* wrongful means such as coercion and intimidation. *United States v. Doss*, 630 F.3d 1181, 1190 (9th Cir. 2011).

¶29 In reaching our conclusion in this case, we are guided, in part, by an observation of the Washington Court of Appeals in *State v. Sanders*, 833 P.2d 452, 455 (1992). The Washington Court was deciding a witness tampering/spousal privilege case in the context of sexual child abuse. The court noted, "There is a direct, elemental nexus between the act of tampering and the underlying crime." The underlying crime in this case was Forsythe's brutal beating of his wife Giana while he was drunk and she was recovering

10

from spinal surgery. The PFMA precipitated the tampering offense. In other words, without the PFMA there would be no tampering charge. And while Giana's trial testimony indicated she still loved her husband, she also stated that the beating "destroyed everything I believed in[:] marriage, love, partnership, trust. I lost hope." When asked if she still had hope for her marriage, she replied, "I can't answer that."

¶30     While Giana testified about the PFMA, she was barred from testifying about the letters and their content based upon spousal privilege. But, as we determined above, these letters are not privileged. For this reason, Giana should have been allowed to testify about them and the State should have been allowed to admit them as unprivileged communications through Giana. The District Court erred in its interpretation of the privilege and the manner in which it applied it to testimony and evidence.

¶31     We conclude, however, that the District Court did not abuse its broad discretion by admitting the letters into evidence as they were not privileged. Moreover, the court had the content of the letters, awareness of the vicious nature of the underlying crime, Giana's presence and demeanor on the witness stand and her testimony against Forsythe in the PFMA case, as well as knowledge that Giana had turned over the letters to the prosecuting attorney of her own accord. While the court failed to provide its rationale for admitting the letters, our review of the evidence supports the conclusion that the content of the letters, especially the final letter, was threatening and/or intimidating to a woman who was the victim of such a cruel beating and did not constitute protected marital communication.

11

¶32    We return to the central principle of the privilege—the protection of the marital relationship. As the United States Supreme Court observed:

> When one spouse is willing to testify against the other in a criminal proceeding—whatever the motivation—their relationship is almost certainly in disrepair; there is probably little in the way of marital harmony for the privilege to preserve.

*Trammel v. U.S.*, 445 U.S. 40, 52, 100 S. Ct. 906, 913 (1980).

¶33    Having concluded that Forsythe's letters to Giana were not protected by spousal privilege based upon their threatening and intimidating contents and our analysis in *Nettleton*, we also conclude that our ruling is supported by the express language of the spousal privilege statute. Section 26-1-802, MCA, quoted in full in ¶ 17 above, provides that the "privilege does not apply . . . to a criminal action or proceeding for a crime committed by one spouse against the other . . . ."

¶34    Here, no one disputes that spousal privilege does not apply to the Partner/Family Member Assault charge. The tampering charge, however, clearly arises out of the partner and family member charge and was committed by Forsythe with the specific purpose of frustrating the effective prosecution of the PFMA charge. Indeed, evidence of the letters strongly shows a consciousness of guilt by Forsythe because the letters reveal that he repeatedly sought to prevent Giana from truthfully testifying against him on the assault charge.

¶35    Consequently, and based upon the language of the statute, the case before us is *one* criminal proceeding with *two* charges arising from the same series of events: commission of the PFMA against Giana and Forsythe's attempt to alter the evidence for

12

this particular charge. For this reason as well as those set forth above, Forsythe's letters to Giana were not covered by the privilege because the tampering and PFMA arose from the same set of facts and constitute a "criminal action or proceeding for a crime committed by one spouse against the other . . . ."

¶36 *Did the District Court abuse its discretion by allowing a lay witness to testify regarding handwriting samples?*

¶37 Forsythe alternatively asserts that the District Court erroneously admitted the subject correspondence based on foundational authentication testimony of Tucker in violation of Rule 901(b)(2) (permissible handwriting authentication through lay testimony based on non-litigation-related familiarity) and *State v. Dewitz*, 2009 MT 202, ¶¶ 42-43, 351 Mont. 182, 212 P.3d 1040 (admission of police officer's non-expert handwriting comparison testimony under Rule 901(b)(2) erroneous absent prior non-case-related familiarity). We agree.

¶38 Tucker's testimony regarding his handwriting comparison expertise and his resulting opinion testimony unquestionably constituted expert testimony beyond the scope of permissible lay opinion testimony. The State concedes that it failed to timely identify Tucker as an expert witness on its court-ordered pretrial witness list and thus purported to present his testimony as merely lay opinion testimony. As in *Dewitz*, Tucker had no prior non-case-related familiarity with Forsythe's handwriting. Therefore, the District Court abused its discretion in admitting the subject correspondence based on the foundational authentication testimony of Tucker under Rule 901(b)(2).

13

¶39 In tacit acquiescence, the State asserts that the error was harmless error. In determining whether an error was reversible error or non-reversible harmless error, the first question is whether the error was "structural error" or merely "trial error." *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735.

¶40 "Structural error" is error that affects the framework of the trial process "rather than simply an error in the trial process itself." *Van Kirk*, ¶ 38 (citing *Ariz. v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991)). Whether occurring pretrial or at trial, structural error "is typically of constitutional dimensions" or of such magnitude to fundamentally undermine "the fairness of the *entire* trial proceeding." *See Van Kirk*, ¶ 38 (narrowly characterizing structural error as typically a pretrial phenomenon) (emphasis added). By nature, structural error is not amenable to measure by any particular qualitative or quantitative means. *Van Kirk*, ¶ 38. Presumptively prejudicial, structural error is irrebuttable reversible error not subject to harmless error review under § 46-20-701(1), MCA. *Van Kirk*, ¶¶ 38-39; *State v. LaMere*, 2000 MT 45, ¶¶ 39-50, 298 Mont. 358, 2 P.3d 204.

¶41 In contrast, "trial error" is "error that typically occurs during the presentation of a case to the jury," i.e., the presentation of evidence or jury argument. *Van Kirk*, ¶ 40. By nature, trial error is amenable to comparative qualitative assessment of the "prejudicial impact" of the tainted evidence relative to the other trial evidence. *Van Kirk*, ¶ 40. Not presumptively prejudicial, trial error is subject to harmless error review under § 46-20-701(1), MCA. *Van Kirk*, ¶ 40.

¶42 Upon a determination of a non-structural trial error, the burden shifts to the State to show on the trial record that "no reasonable possibility" exists that the inadmissible evidence "contributed to the conviction." *Van Kirk*, ¶ 47. The State can satisfy this standard by pointing out other admitted "evidence that proved the same facts as the tainted evidence" and showing by qualitative comparison that it could not reasonably have contributed to the conviction. *Van Kirk*, ¶ 47.

¶43 If the tainted evidence was the only evidence tending to prove an element of the charged offense, no basis for qualitative assessment exists and the non-structural error is reversible error. *Van Kirk*, ¶ 47. If the tainted evidence is the only evidence tending to prove a fact other than an element of the charged offense, then the error is harmless if the State can show by qualitative comparison to the other trial evidence that the tainted evidence could not reasonably have contributed to the conviction. *Van Kirk*, ¶ 47.

¶44 In this case, the tainted evidence was Tucker's handwriting identification testimony offered pursuant to Rule 901(a) to prove the foundational authenticity of the subject correspondence rather than as proof of an element of the charged offense. This evidence was not of constitutional dimension or such significance to fundamentally undermine "the fairness of the entire trial proceeding" in a manner not amenable to comparative qualitative assessment of prejudice. Rather, this evidence was merely foundational evidence readily amenable to comparative qualitative assessment of prejudice. Therefore, we conclude that the erroneous admission of Tucker's expert handwriting identification testimony was merely non-structural trial error subject to harmless error review.

¶45    In that regard, other compelling evidence authenticated the subject correspondence as Forsythe's writing independent of Tucker's testimony. First, as a non-exclusive means of proof of authenticity under Rule 901(a), "a witness with knowledge" may testify "that a matter is what it is claimed to be." Rule 901(b)(1). Thus, unless beyond the realm of lay knowledge, a witness may give non-expert opinion testimony "as to the genuineness of handwriting" based on "familiarity not acquired for purposes of the litigation." Rule 901(b)(2). Here, Giana testified unequivocally that she received the subject correspondence from her husband. Forsythe does not dispute that his wife was familiar with his handwriting or that she did not acquire that familiarity for purposes of litigation.

¶46    Second, as another non-exclusive means of proof of authenticity under Rule 901(a), a lay jury may determine the foundational authenticity of evidence by comparison "with specimens which have been authenticated." Rule 901(b)(3). Unless beyond the realm of lay knowledge, the jury may make this foundational determination by recognition and comparison of "[d]istinctive characteristics and the like," including, inter alia, their "[a]ppearance, contents, substance, internal patterns or other distinctive characteristics, *taken in conjunction with [the] circumstances*" *at issue*. Rule 901(b)(4) (emphasis added). Here, without objection, the court admitted three signed, handwritten letters from Forsythe to the court. Also admitted into evidence and not at issue on appeal was a "Notice of No Contact" acknowledgement bearing Forsythe's handwritten signature.

¶47    Forsythe has made no assertion or showing here or below that accurate comparative authentication of the subject correspondence was a matter beyond the realm

16

of lay knowledge requiring expert testimony. Thus, Tucker's handwriting identification testimony was merely cumulative to other evidence proving the foundational authenticity of the subject correspondence as written by Forsythe.

¶48 The other cumulative evidence proving the foundational authenticity of the subject correspondence was qualitatively and quantitatively compelling independent of Tucker's testimony. The record manifests that the handwriting styles in the tainted correspondence and Forsythe's other untainted handwriting examples were distinctly similar. In its bench ruling, the District Court found that the handwriting on the subject correspondence was "so distinct" that "anybody" could identify Forsythe's handwriting. Though somewhat altered in some of the letters, the writing styles still remained substantially similar in most regards. The fact that some of the letters purported by signature to have been written by somebody other than Forsythe was nonsensical juxtaposed against their distinctive content contrarily identifying the author as a close acquaintance of Forsythe's wife and the subject of a criminal prosecution in which she was the key witness.

¶49 Giana's undisputed familiarity with her husband's handwriting, her unequivocal testimony that she received the subject correspondence from him, the substance of the correspondence, the corroborating surrounding circumstances, and the lack of any evidentiary basis upon which to reasonably conclude that somebody other than Forsythe authored the subject correspondence were independently compelling evidence of the foundational authenticity of the letters. Therefore, we conclude that there is no reasonable possibility that the admission of Tucker's late-disclosed expert handwriting identification testimony significantly contributed to his conviction.

17

¶50 As for the dissent's concern that Forsythe was not notified of Tucker's testimony and could not prepare to defend against, it is unwarranted. Forsythe knew well in advance of the trial that Tucker would be a witness at the trial. Furthermore, as of the hearing in July, Forsythe knew exactly what Tucker's testimony would be. Consequently, Forsythe was not taken by surprise by Tucker's handwriting analysis testimony. While Forsythe again objected at trial that Tucker had not been noticed as an expert, at the time the letters were submitted to the jury, Forsythe's only objection was spousal privilege. Forsythe offered no closing statement or rebuttal witnesses to address Tucker's testimony. For these reasons and the reasons presented above, Forsythe cannot establish that Tucker's testimony was prejudicial; consequently, the admission of the letters was harmless error. Therefore, we conclude that the erroneous admission of Deputy Tucker's handwriting identification testimony was harmless error.

¶51 *Did the District Court impose an illegal sentence by ordering Forsythe to pay a $20 information technology surcharge?*

¶52 Lastly, the State concedes that the District Court imposed an illegal sentence when it ordered Forsythe to pay a $20 information technology surcharge when the statute authorizes a single $10 surcharge per criminal case.[2] While we typically remand a judgment to the district court for modification, we conclude a remand is unnecessary in this case. Section 46-20-703(1), MCA, authorizes this Court, as "the reviewing court . . . to modify the judgment or order from which the appeal is taken." Relying on

---

[2] Section 3-1-317(1)(a), MCA, mandates, with some inapplicable exceptions, that "all courts of original jurisdiction shall impose on a defendant in criminal cases, a $10 [information technology] surcharge upon conviction for any conduct made criminal by state statute or upon forfeiture of bond or bail."

18

this statute in *State v. Fitzpatrick*, 247 Mont. 206, 805 P.2d 584 (1991), we modified Fitzpatrick's sentence on appeal after concluding the district court erroneously imposed sentences that exceeded the statutory maximum allowed. As we are merely modifying Forsythe's sentence to reduce a $20 surcharge to a $10 surcharge, we do so under the authority set forth in § 46-20-703(1), MCA. It is hereby ordered that Forsythe's judgment be amended accordingly.

## CONCLUSION

¶53 For the foregoing reasons, we affirm the District Court's evidentiary rulings and modify Forsythe's sentence as it pertains to the imposed information technology surcharge.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ DIRK M. SANDEFUR

Justice Laurie McKinnon, concurring.

¶54 I agree with the Court in all respects, with the exception that I would conclude, based solely upon the language of § 26-1-802, MCA, the spousal privilege does not apply and not, as the Court does, upon an extension of *Nettleton* and a finding that the letters were intimidating and threatening. The Legislature, by enacting § 26-1-802, MCA, established the spousal privilege, as well as the exception to that privilege. It is not

19

necessary to extend *Nettleton*, which abrogated the spousal privilege for reasons not set forth in § 26-1-802, MCA, as the tampering charge arises out of the PFMA and was committed by Forsythe with the purpose to frustrate effective prosecution of the PFMA. In my opinion, the case before us is one criminal prosecution with two charges, and I would conclude the communications are not protected pursuant to the plain language of the statutory exception because this is "a criminal action or proceeding for a crime committed by one spouse against the other . . . ." Section 26-1-802, MCA.

¶55 The Court relies on *Nettleton* to find that the letters were intimidating and/or threatening and that the central principle of the privilege—protection of the marital relationship—was not advanced by excluding the letters. Opinion, ¶¶ 31, 33. *Nettleton* involved threats by the husband to his then-wives of death, stalking, physical violence, and killing the parties' child. Similarly, in *Edwards*, ¶ 20, the communications held not to be privileged were statements by Edwards to his wife, made while pointing a shotgun at her, that he would kill her and her family and burn down her grandmother's house. Our holdings in *Nettleton* and *Edwards* did not construe the statutory exception contained in § 26-1-802, MCA, and were, in actuality, a judicially created exception to the statutorily created spousal privilege. As such, I am hesitant to extend precedent when it is not in accord with the clear language of a statute which specifically and directly addresses the same subject-matter. Further, extending *Nettleton* requires the trial court to climb the slippery slope of deciding when a statement is threatening or intimidating and damaging of the marital relationship, particularly in the absence of testimony from the

victim that she was so threatened or intimidated and that the marriage was over.[1]  I think the better course, and that set forth in the language of the statute, is that the tampering charge is clearly part of the same proceeding as the PFMA and arose out of and is intricately related to the PFMA.  On this basis only, I would conclude that the letters are not protected by the spousal privilege.

¶56    The role of this Court in the construction of a statute "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been asserted."  Section 1-2-101, MCA. This Court has repeatedly held that we must seek to implement the intention of the Legislature when interpreting a statute.  *In re K.M.G.*, 2010 MT 81, ¶ 26, 356 Mont. 91, 229 P.3d 227 (citing § 1-2-102, MCA; *Montana Vending Inc. v. Coca-Cola Bottling Co.*, 2003 MT 282, ¶ 21, 318 Mont. 1, 78 P.3d 499). We determine the intention of the Legislature first from the plain meaning of the words used, and if interpretation of the statute can be so determined, we may not go further and apply any other means of interpretation.  *State v. Trull*, 2006 MT 119, ¶ 32, 332 Mont. 233, 136 P.3d 551 (citing *Dunphy v. Anaconda Co.*, 151 Mont. 76, 79-81, 438 P.2d 660, 662 (1968)); *see also Tongue River Elec. Coop. v. Montana Power Co.*, 195 Mont. 511, 515, 636 P.2d 862, 864 (1981) (citing *Haker v. Southwestern R.R.*, 176 Mont. 364, 369, 578 P.2d 724, 727 (1978); *State ex rel. Huffman v. District Court*, 154 Mont. 201, 204, 461 P.2d 847, 849 (1969)).  "In the search for plain meaning, 'the language used must be reasonably and logically interpreted, giving

---

[1] During trial, Giana did not testify she was threatened or intimidated and she was unwilling to definitively state her marriage to Forsythe was over.

21

words their usual and ordinary meaning.'" *Gaub v. Milbank Ins. Co.*, 220 Mont. 424, 427, 715 P.2d 443, 445 (1986) (quoting *In re McCabe*, 168 Mont. 334, 339, 544 P.2d 825, 828 (1975)).

¶57 In my opinion, the language of § 26-1-802, MCA, is plain and unambiguous. We are thus not required to extend the judicially created exception we made in *Nettleton* and *Edwards*, which likely was made pursuant to the compelling circumstances of those cases. While I do not disagree that the substance of Forsythe's communications, particularly the fifth communication, were designed to threaten and intimidate Giana, the legislature has struck a balance, through its enactment of § 26-1-802, MCA, between protection of the marital relationship and when that protection is no longer deserving. It is not the role of a judge or this Court to expand on that exception, regardless of whether we agree with the balance struck by the Legislature, and particularly when it is unnecessary.

¶58 The plain language of the statutory exception itself applies to remove from protection the communications made by Forsythe because the case before us is one "criminal action or proceeding" with two charges arising from the same series of events. I would only apply the statutory exception contained in § 26-1-802, MCA, to conclude the letters were not protected spousal communications.


/S/ LAURIE McKINNON

22

Justice Dirk M. Sandefur joins in the concurring Opinion of Justice McKinnon.

/S/ DIRK M. SANDEFUR

Justice Jim Rice, concurring in part and dissenting in part.

¶59   I agree with the Court's analysis under the first issue regarding spousal privilege, but disagree with the conclusion reached under the second issue regarding the expert testimony that was admitted concerning Forsythe's letters.  It is vital to maintain the distinction between lay witnesses and expert witnesses[1] and to properly analyze the error when this distinction is lost.

¶60   At trial, the State repeatedly claimed Tucker was simply a lay witness.  As the State acknowledges on appeal, this assertion was incorrect—Tucker indeed offered expert testimony.  As we recently explained, "if testimony crosses from lay to expert testimony the witness must be recognized as an expert by the court or error occurs." *State v. Kaarma*, 2017 MT 24, ¶ 86, 386 Mont. 243, ___ P.3d ___.  Designating a witness as an expert bears significantly on trial preparation and failure to do so can be prejudicial to the other side.  *See Superior Enters. LLC v. Mont. Power Co.*, 2002 MT 139, ¶¶ 18-20, 310 Mont. 198, 49 P.3d 565.  In the criminal context, any error must be analyzed under the *Van Kirk* test.  *State v. Van Kirk*, 2001 MT 184, 306 Mont. 215, 32 P.3d 735.  While

---

[1] Chief Justice Gray highlighted this point when she dissented in *State v. Henderson*, 2005 MT 333, 330 Mont. 34, 125 P.3d 1132, stating, "In my opinion, our cases on the issue of whether 'official' personnel may testify as lay witnesses based on their training and experience are in disarray and require clarification for the purpose of guiding trial judges and attorneys in future civil and criminal cases on this increasingly confused subject."  *Henderson*, ¶ 27 (Gray, C.J., dissenting).  Chief Justice Gray's words have proved prophetic.  *See generally Henderson*, ¶¶ 28-32 (Gray, C.J., dissenting) (summary of case law demonstrating the development of two separate lines of cases regarding testimony of "official personnel").

the Court acknowledges that Tucker's testimony constituted an authentication error under M. R. Evid. 901(b)(2), and proffers a *Van Kirk* analysis, the Court's analysis is legally incorrect and factually inconsistent with the record. I believe the Court has significantly watered down the *Van Kirk* standards and has failed to "insure that the substantial rights of the defendant are not prejudiced by the admission of tainted evidence." *Van Kirk*, ¶ 50.

¶61 As an initial matter, the fact should not be lost that the State tried this case with expert testimony, which was noticed, at best, some 12 days before trial was to begin. Although he correctly objected to the expert aspects of Tucker's testimony, Forsythe was left without time to obtain expert testimony to rebut it. This resulted in further prejudice to Forsythe.

¶62 The Court takes the most unusual step of conducting its own handwriting analysis of the letters, and concludes therefrom that, "[t]hough somewhat altered in some of the letters, the writing styles still remained substantially similar in most regards." Opinion, ¶ 46. It should go without saying that an appellate court has no expertise in handwriting analysis; but beyond that, the problem the Court fails to acknowledge is that the *only* explanation about these "writing styles" provided during the trial was Tucker's inadmissible testimony. Without that, the jury would have been left to their own devices in analyzing the letters, which, as evidenced by these two samples, were written in different styles.[2]

---

[2] Sample 1 is an excerpt from State's Exhibit 2E and Sample 2 is an excerpt from State's Exhibit 2C.

**Sample 1**

Beat and they Know It, and Now the Fucks are trying anything Including using you. The only way that I can lose is If You testify against ME. So, get afuckin hold of Your-SELF.... Now! Yougive UP so

**Sample 2**

You should CALL The D.A.'s OFFICE AND TELL Them That You wont TEStify AgAINSt ME, AND You NEEd ME HomE Right AWAY.

¶63     Some of the letters forming the basis of the tampering charge stated that they were from persons other than Forsythe, and the altered writing style was apparently employed to further Forsythe's alleged subterfuge.  Thus, under the State's theory of the case, it was necessary to establish that the letters were written exclusively by Forsythe.  I think it is possible that a rational jury, looking only at the letters, without guiding expert testimony, could have had doubt about whether the letters were written by the same person.  In order to establish they were all written by Forsythe, the State offered Tucker, who offered expert testimony to assist the jury, as follows:

> [State's counsel:] Q.   And did you use *accepted procedures* to analyze
> these letters?
> [Tucker:] A.     Yes, I did.

25

Q.     Now, since then have you had the opportunity to compare those exhibits [(the letters allegedly written by Forsythe and sent to his wife)] to other writings [(the letters allegedly written and signed by Forsythe and sent to the District Court)]?
A.     Yes, I have.

.     .     .

Q.     What's unique about these letters?

.     .     .

A.     *For example, the letter E, regardless of where the letter was in a word or in a sentence, it was always the same letter form.*  Particularly, there are some, what we call, hiatuses in writing, particularly with the *capital letter M, on the upper left-hand corner of the M, there's a hiatus, which is basically a lift in the pen, the writing, so that the writing doesn't connect in that spot, and that's consistent throughout all of the writing that I looked at.  Also, the slope and slant of the t-bar and the I is very -- very distinct in all of this writing.*

.     .     .

Q.     And you've *reached an opinion* [about the letters]?
A.     Yes, the opinion that I've reached between both sets [of letters] . . . the writing that I was given that was written to the Judge and the writing I was given that was allegedly written to . . . [Forsythe's wife], I consider *them not verifiable as far as to who the author actually is, so I consider them questioned documents.  But I did compare them together, and my* **professional opinion** *is that they were written by the same author, both sets of letters.*

(Emphasis added.)

¶64     Tucker provided substantive, technical testimony.  He applied "accepted procedures," analyzed the letters, and offered a *professional opinion* that "they were written by the same author, both sets of letters."  The State did not present *any* other evidence proving this point.

¶65     The Court deals with the problem of Tucker's inadmissible testimony, first, by minimizing it as "merely foundational evidence."  Opinion, ¶ 42.  It was much more than that.  As the Court here affirms, the letters were properly admitted during the trial on the basis of Giana's testimony that she had received them.  *See* Opinion, ¶ 31 ("[T]he District

26

Court did not abuse its broad discretion by admitting the letters into evidence as they were not privileged."). Tucker's testimony was not necessary to lay additional foundation for admission of the letters. Rather, as evident from the quoted testimony above, the State used Tucker to accomplish a qualitatively different purpose—to establish, by *scientific analysis and opinion*, that all eight letters at issue had been written by the same person, which was necessary to establish the tampering charge. The Court's dismissive characterization of Tucker's testimony as "merely cumulative to other evidence proving the foundational authenticity" of the letters, Opinion, ¶ 45, fails to comprehend the significance of the testimony and the State's purposes.

¶66 Secondly, the Court minimizes the effect of Tucker's testimony by manufacturing its own, non-record evidence. It relies, repeatedly, on the asserted facts that Giana "was familiar" with Forsythe's handwriting and that she "did not acquire that familiarity for purposes of litigation." Opinion, ¶¶ 43-47. However, there is absolutely no evidence of these things in the record. About the letters, Giana testified only that she had received them. The sum total of her testimony was as follows:

> [State's counsel:] Q. Now, Gianna, at some point, you received letters --
> [Gianna:] A. Yes.
> Q. - - from your husband?
> A. Yes.
> Q. How many did you receive?
> A. I think five. I think four, five.
> Q. Did you eventually turn those letters over to law enforcement?
> A. Yes.

The absence of any evidence in the record forces the Court to turn these non-record assumptions into evidence on the basis that "Forsythe does not dispute" them. Opinion,

27

¶¶ 43, 47. It need only be asked: How was Forsythe supposed to dispute evidence that was never introduced? Forsythe likewise did not dispute a great many other things that were not introduced, but that does not magically turn these things into record evidence.

¶67 Another problem the Court fails to see is the impact on the trial of the tainted testimony *in combination with* the admitted letters. The jury's assessment of the letters was polluted by the improper expert testimony that affirmatively concluded all of the letters were written by the same person. The jury was not allowed to draw a conclusion about the letters themselves. While the Court offers that a lay jury may determine foundational authenticity by comparison to other specimens, Opinion, ¶ 44, it fails to recognize that this province of the jury was invaded here by Tucker's improper expert testimony.

¶68 As we recently explained in *Kaarma* about the same error:

> Inadmissible evidence will not be found prejudicial so long as the jury was presented with "admissible evidence that proved the same facts as the tainted evidence proved." *Van Kirk*, ¶ 43. This presented evidence must be admissible and of the same quality of the tainted evidence such that there was *no reasonable possibility* that it might have contributed to the defendant's conviction. *Van Kirk*, ¶ 44.

*Kaarma*, ¶ 89 (emphasis added). Here, as noted, no other evidence proving the same facts as the tainted evidence was introduced by the State. While the Court reasons that the tainted evidence was not significant enough to "undermine the fairness" of the trial because it was "merely" foundational evidence, Opinion, ¶ 42, the above discussion demonstrates otherwise. This evidence went directly to the elements of

28

tampering—Tucker's testimony alone uniquely demonstrated scientifically that all the letters had been written by Forsythe. Thus, the State cannot meet its burden.

¶69 "Moreover, the State must also demonstrate that the *quality* of the tainted evidence was such that there was no reasonable possibility that it might have contributed to the defendant's conviction." *Van Kirk*, ¶ 44 (emphasis in original). In my view, Tucker's expert testimony was of a significant quality, as it affirmatively declared on the basis of technical knowledge that a single author had written all of the letters, despite the facial differences in handwriting. No other evidence did so, and Tucker's expert testimony was powerful evidence to a lay jury. Thus, the State cannot establish that the error was harmless under this inquiry, either. Consequently, reversal here is "compelled." *Van Kirk*, ¶ 45. The State—and the Court, I would add—have failed to demonstrate "no reasonable possibility exists that the admission of the tainted evidence might have contributed to the defendant's conviction." *Van Kirk*, ¶ 46. The Court's approach subverts the *Van Kirk* inquiry and returns to the subjective, ad hoc analysis of the record we sought to abandon by adopting the *Van Kirk* standards. *Van Kirk*, ¶¶ 35-36.

¶70 Believing the expert testimony from Tucker was prejudicial under these circumstances, I would reverse and remand for a new trial.

/S/ JIM RICE

Justice Beth Baker joins in the concurring and dissenting Opinion of Justice Rice.

/S/ BETH BAKER

29